AVTEL SERVICES, INC., Plaintiff,

v.

UNITED STATES, Defendant,

and

King Aerospace, Inc., Defendant–Intervenor.

Nos. 04–1574C, 05–582C.

United States Court of Federal Claims.

Filed Dec. 22, 2005 [1].

Reissued for Publication March 17, 2006.

1. This opinion was issued under seal on December 22, 2005. The parties were instructed to propose material for redaction. The original opinion is reissued with redactions indicated by the designation "[deleted]."

Howell R. Riggs and David H. Stem, Huntsville, Alabama, Joe R. Reeder, Joanne W. Young, David M. Kirstein, Greenburg Traurig, LLP, Washington, DC, for the plaintiff.

Elizabeth A. Holt and William K. Olivier, Trial Attorneys; Todd M. Hughes, Assistant Director; David M. Cohen, Director, Commercial Litigation Branch, Civil Litigation Division, United States Department of Justice, Washington, DC, for the defendant.

Major Kevin Robitaille and Major Patrick Gary, United States Army Litigation Division, Washington, DC; Wesley G. Smith, Redstone Arsenal, Alabama, of counsel.

Paul W. Searles, Sharon N. Freytag and Holly L. Clarke, Haynes and Boone, LLP, Dallas, Texas, for the defendant-intervenor.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The Army issued solicitation W58RGZ–04–R–0524 in May, 2004, seeking proposals to provide maintenance and logistical support for the United States Army's nine De Havilland DHC–7 (Dash 7) aircraft. Plaintiff Avtel Services, Inc. has filed both pre- and post-award bid protests, on successive grounds, on the United States Army Aviation and Missile Command solicitation for aircraft maintenance services and logistical support. Plaintiff Avtel is the incumbent contractor on a contract issued in 1999 for similar maintenance support services on the same Dash 7 aircraft. Avtel believes that a competitor, King Aerospace, Inc., obtained Avtel's competition sensitive and proprietary data, which provided King Aerospace with an unfair competitive advantage in the 2004 resolicitation of aircraft maintenance support services. Avtel raised its concerns in an agency-level protest to the Army's contracting officer, who, in a September 29, 2004 agency response, concluded that the protest was untimely. The contracting officer also declined to disqualify King at that time, deferring the issue, but noting that the alleged information obtained from Avtel employees did not appear to be proprietary and that a 1999 Avtel Dash 7 proposal in King's possession appeared to be obsolete, given the changes made to the 2004 Dash 7 solicitation. Subsequently, in a formal, December 8, 2004 opinion, the Army contracting officer denied Avtel's request to disqualify King, concluding, among other considerations, that the data in question was not competition sensitive or proprietary as claimed by Avtel. Avtel, for its part, characterizes this case as one involving "industrial espionage" on the part of

competitor King Aerospace. King Aerospace, the ultimately successful bidder, intervened in this bid protest action, and has provided the court with its views of the allegations. King essentially argues that the information at issue was volunteered by Avtel employees, was not proprietary to Avtel, and was in the public domain.

As noted, the Army's latest Dash 7 solicitation was issued in May, 2004. Prior to and after the solicitation was issued, King Aerospace employees communicated with Avtel employees who were working on the 1999 Dash 7 maintenance support services contract. The parties have stipulated that, on January 28, 2004, the founder and Chief Executive Officer (CEO) of King Aerospace, Jerry A. King, and King's Controller, Keith Weaver, met with Donald N. Wilbanks, an Avtel employee at the time. Mr. Wilkins had signed a confidentiality agreement with Avtel prohibiting him from disclosing any Avtel proprietary or confidential data. In this regard, the parties have stipulated that Mr. King instructed Mr. Wilbanks "not to answer any questions that he [Mr. Wilbanks] felt uncomfortable with." The record contains a little over eight pages of single-spaced, typed notes of the questions asked of Mr. Wilbanks, and of his responses, compiled by King employee Keith Weaver. The first page of Mr. Weaver's notes stated that: "Don [Wilbanks] confirmed that there would be certain things he would not be at liberty to discuss as an employee of Avtel. He limited his answers for the questions below to topics he felt were fair to discuss." Under the heading "Program," in Mr. Weaver's notes, were twenty-three questions and answers; under the heading "People," were twelve questions and answers; under the heading "Deployment," were five questions and answers; under the heading "Government/Army Information," were six questions and answers; under the heading "Miscellaneous," were five questions and answers; under the heading "Korea Site," were nine questions and answers; and under the heading "Overall Synopsis," were three questions and answers. King Aerospace's notes concluded with eleven entries under the heading "Notes & Comments."

The numerous questions asked by King Aerospace employees and answered by Mr. Wilbanks covered diverse areas, such as average flying hours; frequency of airplane painting and washing; staffing levels; government furnished equipment (GFE); the value of Avtel property not furnished by the government; whether any GFE tooling or equipment was lacking; government furnished vehicles; the role, location, and number of employees at the Avtel Program Office in Alabama; the difficulty in maintaining mission capable rates; identification of De-Havilland as a supplier; reported repair station violations; strengths and weaknesses of mission equipment contractors; Avtel's engineering support; annual parts and equipment audit; insurance benefits; personnel turnover; wage levels and deployment pay differentials; current conditions of deployment; Army documentation required; recommendations of individuals who could assist King Aerospace with its proposal; Korea site information, including the Korea site manager, cost of living allowance, overtime policy, normal shift and duty times, and special equipment in Korea; and the name of an individual at Volvo Aerospace who could be contacted concerning parts. King Aerospace offered Mr. Wilbanks employment if King were to be awarded the Dash 7 contract. Mr. Wilbanks later declined the employment offer.

King Aerospace employees also met with Scott Garretson, a Dash 7 mechanic working for Avtel, on January 30, 2004. King Aerospace Controller Keith Weaver compiled notes of the meeting, which reflected that Mr. Garretson had indicated "there were areas that he would not be able to talk about as an Avtel employee." Mr. Weaver's notes indicate that the topics discussed with Mr. Garretson generally had to do with deployments: the difficulties in communicating with families when deployed, returning home from deployed locations for family emergency reasons, living conditions while deployed, relationships with others while deployed, work schedule, morale, dangers, compensation, and hiring new mechanics. Mr. Weaver's notes indicate interest in employment on the part of Mr. Garretson, should King Aerospace win the contract.

King Aerospace Business Development Officer Larry Breau also contacted Michael Barber, an Avtel employee, who was offered employment with King should King win the contract. The contacts occurred after Mr. Barber began working for Avtel in January, 2004, including communications in the late May and early June, 2004 time frame. According to an affidavit by Mr. Barber, contained in the record, the topics discussed by Mr. Breau and Mr. Barber included the number of Avtel employees working on the Dash 7 contract, the sources for Dash 7 parts, and any Avtel employees who might want to work for King, if King won the contract. Mr. Barber's affidavit also indicates that he had cautioned Mr. Breau to be careful about the kinds of questions asked.

The record also reflects that King Aerospace Business Development Officer Breau was in contact with Avtel employee Isaiah House in the late May and early June, 2004 time frame. Mr. Breau inquired of Mr. House as to the employment interests of Avtel employees, in the event King won the contract, and also about deployment details. Mr. House was offered employment with King, should King win the contract. The parties have further stipulated to contacts between King personnel and Avtel employees Rex Burson, Lorrie Cortez, Judy Boutillette, Robbin Gibbs, Fred Metcalf, Brian James and John Karkkainen, concerning potential employment.

In addition to the above communications between King and Avtel employees concerning the current Dash 7 contract, King obtained a version of Avtel's 1999 Dash 7 proposal from former Avtel owner Kent Lebo. The record contains an August 1, 2004 letter from Avtel's counsel to the Army contracting officer for the Dash 7 procurement, stating that Avtel's counsel was first informed of King's possible possession of a version of Avtel's 1999 Dash 7 proposal on July 15, 2004 and that Avtel reviewed the document on July 22, 2004 and verified that the document was in fact, a version of Avtel's 1999 proposal.

The 1999 Avtel Dash 7 proposal given to King is included in the record of this case. The cover page of the proposal received by King was marked "**SOURCE SELECTION SENSITIVE,**" and contained the following legend:

> This proposal includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed—in whole or in part—for any purpose other than to evaluate this proposal or quotation. If, however, a contract is awarded to this offeror or quoter as a result of—or in connection with—the submission of this data, the Government shall have the right to duplicate, or use, or disclose the data to the extent provided in the resulting contract. This restriction does not limit the Government's right to use information contained in this data if it is obtained from another source without restriction. All data contained in this volume is subject to this restriction.

Each page of Avtel's 1999 Dash 7 proposal contained the following: "Source Selection Sensitive," and "Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document." The version of Avtel's 1999 Dash 7 proposal in King's possession included the following standard proposal sections: executive summary, technical proposal, management proposal, past performance, and pricing proposal. The pricing proposal contained pricing backup data, including itemized pricing data for each contract year, through option year 2004; monthly unit pricing adjustment data for each contract year and beddown base; and a grand summary pricing matrix, containing a summary of cost and pricing data for each contract year, including option year 2004.

On June 7, 2004, Avtel filed a complaint against King Aerospace in the United States District Court for the Middle District of Alabama. The complaint in that case alleged that King had sought the 1999 Avtel proposal and other proprietary and competition sensitive information from Avtel employees, and cited the Procurement Integrity Act, 41 U.S.C. § 423 (2000), as implemented by Federal Acquisition Regulation (FAR) 3.104 (2004). On this basis, Avtel sought to disqualify King from participating in the solicitation now under review in this court.

On June 8, 2004, King filed a complaint against Avtel in the United States District Court for the Western District of Texas, seeking a declaratory judgment that King's actions did not violate the Procurement Integrity Act. The Alabama District Court case was transferred to and consolidated with the Texas District Court case. The Texas District Court case was stayed, pending litigation in the Court of Federal Claims.

On July 30, 2004, Avtel filed an agency protest with the Army contracting officer. The protest sought to disqualify King from the Dash 7 solicitation and award, based on allegations that King had sought Avtel's competition sensitive and proprietary information. On September 29, 2004, the Army contracting officer dismissed Avtel's protest as untimely, and deferred a decision on disqualifying King.

On October 19, 2004, plaintiff Avtel filed a complaint (no. 04–1574C) in the Court of Federal Claims to disqualify King from competing in the solicitation, filed a first amended complaint on October 20, 2004, and refiled a first amended complaint on November 30, 2004. In this court, Avtel claims that King sought and obtained competition sensitive and proprietary information, thereby providing King with an unfair competitive advantage. On December 8, 2004, the Army contracting officer issued a final decision, denying Avtel's request to disqualify King from the current solicitation. The contracting officer, in a detailed opinion, generally found the information at issue to be in the public domain, or to provide no competitive advantage due to the differences between the 1999 Dash 7 procurement and the current Dash 7 procurement. On May 17, 2005, after the Army's December 8, 2004 contracting officer's final decision, Avtel filed a new complaint (no. 05–582C), seeking a review of the contracting officer's final decision and again claiming that King had an unfair competitive advantage by seeking and obtaining competition sensitive and proprietary information from Avtel employees and through receipt of the 1999 Avtel proposal.

The Source Selection Evaluation Board for the 2004 Dash 7 procurement included, among others, Henrietta Maples, Michael Botkin and Michael Courtemanche, who were to evaluate the Logistics Concept Element in the proposals received. Avtel, however, expressed concerns about the neutrality of certain SSEB members. Upon review, Valeta Crandall, the current Dash 7 Source Selection Authority, determined that it would be in the best interests of the government to replace these three SSEB board members. The three evaluators were removed in late December, 2004, before award, and replaced with two new members, Monika Diaz and Michael Fitzpatrick, in January, 2005.

On April 22, 2005, Dash 7 Source Selection Authority Crandall concluded that King's proposal offered the best overall value to the Army. Avtel requested a debriefing on the Dash 7 procurement, and the Army provided the debriefing on June 6, 2005. Due to the pending litigation in this court the Army did not proceed with the award to King, but continued incumbent Avtel's 1999 contract on a temporary basis until June 30, 2005. On June 17, 2005, however, the defendant filed a notice of intent to award the Dash 7 contract to King on June 30, 2005. The Army indicated it was concerned that uncertainties associated with the bid protest and bridge contracts to Avtel were affecting aircraft availability and mission capable rates. The Army concluded that, for reasons of national security, it was necessary to proceed with the award process. In light of the impending award to King, plaintiff sought injunctive relief. The court held hearings on June 21 and 29, 2005 and, in a bench ruling on June 29, 2005, denied plaintiff's request for pre-award injunctive relief.

On June 30, 2005, the Army awarded the Dash 7 contract to King. Subsequent to the award to King and Avtel's debriefing, on July 15, 2005, Avtel filed its first amended complaint under case no. 05–582C. In addition to its earlier claims that King had obtained competition sensitive and proprietary information from Avtel employees and from a version of the 1999 Avtel Dash 7 proposal King had obtained, plaintiff added several allegations. First, plaintiff alleges that a Naval Postgraduate School thesis by Henrietta Maples, a Dash 7 program manager, contained competition sensitive information

about Avtel and the Dash 7 contract. Plaintiff also contends that the placement of the Maples thesis in the public domain was a breach of the government's duty of good faith and fair dealing. Plaintiff further contends in its first amended complaint (no. 05–582C) that Army officials were biased against Avtel, and that the bias was reflected in the scoring of the technical evaluation of King's and Avtel's proposals. Finally, plaintiff contends that King submitted a proposal with unbalanced pricing, and that the Army failed to conduct the required cost analysis. Plaintiff seeks cancellation of the award of the Dash 7 contract to King and award to Avtel or, in the alternative, cancellation of the award and resolicitation. The parties briefed the new issues in the plaintiff's first amended complaint and the court heard oral argument on the new issues on August 24, 2005. Shortly thereafter, the court issued an August 30, 2005 bench ruling denying the plaintiff's request for injunctive relief. This opinion provides written documentation of the bench ruling.

### DISCUSSION

*Jurisdiction*

The Tucker Act, 28 U.S.C. § 1491(b)(1), grants the United States Court of Federal Claims jurisdiction over bid protests brought by:

> an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts[2] of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2000).

As a threshold matter, defendant-intervenor King Aerospace challenged the court's jurisdiction over the plaintiff's claims. King

alleged that this court lacked jurisdiction over the instant case because Avtel's complaint did not object to the agency's solicitation nor seek relief based on a violation of a statute or regulation. King alleged that this court lacked jurisdiction before there was a decision from the contracting officer to which Avtel could object. However, the contracting officer issued a final decision on December 8, 2004, to which Avtel objected, and Avtel filed a new complaint (no. 05–582C) on May 17, 2005, reflecting its objections. Plaintiff Avtel and the defendant have agreed that, under the Tucker Act, this court has jurisdiction over plaintiff's bid protest.

Plaintiff King complains of a jurisdictional defect despite the fact that Avtel filed a new complaint. King alleges that the Procurement Integrity Act, 41 U.S.C. § 423, requires the plaintiff to bring its bid protest before the Government Accountability Office (GAO) within fourteen days of first discovering the possible violation. *See* 41 U.S.C. § 423. The Procurement Integrity Act defines "protest" as "a written objection by an interested party to the award or proposed award of a Federal agency procurement contract, pursuant to subchapter V of chapter 35 of Title 31," a subchapter which establishes the GAO's jurisdiction. 41 U.S.C. § 423(f)(6); 31 U.S.C. § 3552 (2000). Furthermore, the Act provides that the Comptroller General of the United States may consider such a protest alleging a violation of the Procurement Integrity Act if the complainant filed its protest no later than fourteen days after first discovering the possible violation. *See* 41 U.S.C. § 423(g). Therefore, King concludes that Avtel should have brought its bid protest before the GAO and that this court lacks jurisdiction to consider this case.

In contrast, as noted, defendant does not contest the court's jurisdiction in this bid protest action, pointing out that the Tucker Act confers jurisdiction on this court over a protest by an interested party of "a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement ...." 28 U.S.C. § 1491(b)(1). Avtel objected to the

---

2. Pursuant to section 12(d) of Public Law 104–320, the jurisdiction of United States District Courts over bid protests terminated on January 1, 2001. *See* 28 U.S.C. § 1491 note.

proposed award of the contract at issue and to the agency's decision on Avtel's allegations that the awardee, King, sought and obtained Avtel's competition sensitive and proprietary data. The provisions of the Procurement Integrity Act include that a federal agency may take action against a person who obtains or discloses procurement information (contractor bid or proposal information or source selection information) before award. *See* 41 U.S.C. § 423(a), (b), (e)(3). The contracting officer, in a December 8, 2004 decision, decided not to take action against King based on Avtel's allegations. This agency decision is being challenged by the plaintiff and reviewed by the court. *See also* FAR 3.104-4(a), which provides that "no person or other entity may disclose contractor bid or proposal information or source selection information to any person other than a person authorized, in accordance with applicable agency regulations or procedures, by the agency head or the contracting officer to receive such information," 48 C.F.R. § 3.104-4(a) (2004); FAR 1.602-2(b), which provides that contracting officers shall "[e]nsure that contractors receive impartial, fair, and equitable treatment," 48 C.F.R. § 1.602-2(b) (2004); *Cent. Arkansas Maint., Inc. v. United States,* 68 F.3d 1338, 1341-43 (Fed.Cir.1995) (in which the Federal Circuit reviewed the Court of Federal Claims' finding that the Procurement Integrity Act had been violated or was about to be violated by an offeror, but vacated the trial court's exclusion of the offending offeror because that court also had found that the that the agency had not acted arbitrarily and capriciously and the procurement was not tainted by the procurement integrity violations); *Naplesyacht.com. Inc. v. United States,* 60 Fed.Cl. 459, 472 n. 9 (raising the question of whether a bidder had pre-bid knowledge of other bidders' proposals and citing the Procurement Integrity Act's prohibition on knowingly disclosing contractor bid or proposal information), *recons. denied* (2004); *Synetics, Inc. v. United States,* 45 Fed.Cl. 1, 13-14 (1999) (concluding that bidders who obtained information about the plaintiff, an incumbent contractor, did not violate the Procurement Integrity Act because the information did not meet the definition of contractor bid or proposal informa-tion and appeared to have been generally available); 41 U.S.C. § 403(7) (2000) ("The term 'responsible source' means a prospective contractor who—(D) has a satisfactory record of integrity and business ethics. . . ."); FAR 9.104-1(d), which provides that, "To be determined responsible, a prospective contractor must—(d) Have a satisfactory record of integrity and business ethics," 48 C.F.R. § 9.104-1(d). The court concludes that it has jurisdiction to review this bid protest.

*Standard of Review*

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act and provided the United States Court of Federal Claims with post-award bid protest jurisdiction for actions filed on or after December 31, 1996. *See* 28 U.S.C. § 1491(b)(1)-(4) (2000). The statute provides that post-award protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970) and the line of cases following that decision. *See, e.g., Galen Medical Assocs., Inc. v. United States* 369 F.3d 1324, 1329 (Fed.Cir.) (citing *Scanwell* for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law."), *reh'g denied* (2004); *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004) ("Under the APA standard as applied in the *Scanwell* line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." '); *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.), *reh'g and reh'g en banc denied* (2003); *Impresa Construzioni Geom, Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001).

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C.

§ 706(2)(A), (2)(D) (2000) [3]; *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed.Cir.2005) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A) (2000)). In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit has discussed specifically subsections (2)(A) and (2)(D) of 5 U.S.C. § 706. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d at 1332 n. 5; *see also NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed.Cir.2004) ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir.))), *reh'g denied* (2000); *Info. Tech. & Applications Corp. v. United States*, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or other-

wise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed.Cir.2001) ("The APA provides that a reviewing court must set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (Supp. V 1999)."), *reh'g and reh'g en banc denied* (2001); *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1290 (Fed.Cir. 1999).

In *Impresa Construzioni Geom. Domenico Garufi v. United States*, the court wrote:

Under the APA standards that are applied in the *Scanwell* line of cases, a bid award may be set aside if either: (1) [T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.... When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir.1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *id.*, and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir.1994). When a challenge is brought on the second ground, the dis-

---

**3.** The full language of section 706 of the APA provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
5 U.S.C. § 706.

appointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." *Kentron [Hawaii, Ltd. v. Warner,]* 480 F.2d [1166,] 1169 [ (D.C.Cir. 1973) ]; *Latecoere,* 19 F.3d at 1356. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33 (selected citations omitted); *see also Banknote Corp. of Am. v. United States,* 365 F.3d at 1351; *OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed.Cir.2000).

■ A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995–96 (Fed.Cir.1996); *Labat–Anderson Inc. v. United States,* 50 Fed.Cl. 99, 106 (2001); *Emery Worldwide Airlines, Inc. v. United States,* 49 Fed.Cl. 211, 222, *aff'd,* 264 F.3d 1071 (Fed.Cir.2001); *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. 614, 619 (2001); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999), *appeal dismissed,* 6 Fed.Appx. 867 (Fed.Cir.2001). The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> The agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *but see In re Sang–Su Lee,* 277 F.3d 1338, 1342 (Fed.Cir.2002) ("The agency must present a full and reasoned explanation of its decision .... The reviewing court is thus enabled to perform a meaningful review ....").

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. *See*

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see also Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. 520, 523 (2003) (quoting *Honeywell, Inc. v. United States,* 870 F.2d at 648 (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d at 1301)). As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see also U.S. Postal Service v. Gregory,* 534 U.S. 1, 6–7, 122 S.Ct. 431, 151 L.Ed.2d 323 (2001) ("[T]he arbitrary and capricious standard is extremely narrow and .... [i]t is not for the Federal Circuit to substitute its own judgment for that of the Board.") (citations omitted); *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *Co–Steel Raritan, Inc. v. ITC,* 357 F.3d 1294, 1309 (Fed.Cir.2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit

stated that "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); *In re Sang–Su Lee,* 277 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.") (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. at 285, 95 S.Ct. 438); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed.Cir.1993); *Gulf Group, Inc. v. United States,* 61 Fed.Cl. 338, 351 (2003) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); *ManTech Telecomms. & Info. Sys. Corp. v. United States,* 49 Fed. Cl. 57, 63 (2001), *aff'd,* 30 Fed.Appx. 995 (Fed.Cir.2002); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))); *Redland Genstar, Inc. v. United States,* 39 Fed.Cl. 220, 231 (1997); *Mike Hooks, Inc. v. United States,* 39 Fed.Cl. 147, 154 (1997); *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663, 672 (1997); *Commercial Energies, Inc. v. United States,* 20 Cl.Ct. 140, 145 (1990) ("In simple terms, courts should not substitute their judgments for pre-award procurement decisions unless the agency clearly acted irrationally or unreasonably.") (citations omitted).

Similarly, in *E.W. Bliss Co. v. United States,* the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir. 1993); *cf. Widnall v. B3H,* 75 F.3d 1577 (Fed.Cir.1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in

reason ... even if the Board itself might have chosen a different bidder"); *In re General Offshore Corp.,* B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).

\* \* \* \* \* \*

Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.,* 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.") ....

*E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996); *see also JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 388 (2001), *aff'd,* 279 F.3d 985 (Fed.Cir.), *reh'g denied* (2002).

In a negotiated procurement, contracting officers are generally afforded even greater decision making discretion, in comparison to their role in sealed bid procurements. "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *Banknote Corp. of Am. Inc. v. United States,* 365 F.3d at 1355 (citing *TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327–28 (Fed.Cir.1996); *E.W. Bliss Co. v. United States,* 77 F.3d at 449; and *Lock-*

heed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59); see also Hayes Int'l Corp. v. United States, 7 Cl.Ct. 681, 686 (1985) ("It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement . . . ." (citing Sperry Flight Sys. v. United States, 212 Ct.Cl. 329, 339–40, 548 F.2d 915 (1977))); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; Am. Tel. and Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed.Cir.2002), cert. denied, 540 U.S. 937, 124 S.Ct. 56, 157 L.Ed.2d 249 (2003); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958; Cybertech Group, Inc. v. United States, 48 Fed.Cl. at 646 ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."). In Burroughs Corporation v. United States, the court described the broad discretion afforded a contracting officer in a negotiated procurement as follows:

> Remarking on the contracting officer's discretion in negotiation, the court in Sperry Flight Systems Division v. United States, 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that "the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for . . ." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising.

Burroughs Corp. v. United States, 223 Ct.Cl. 53, 65, 617 F.2d 590, 598 (1980) (citation omitted; omissions in original); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1555 (Fed.Cir.1995); JWK Int'l Corp. v. United States, 49 Fed.Cl. at 388; ManTech Telecomms. and Info. Sys. Corp. v. United States, 49 Fed.Cl. at 64.

The United States Court of Appeals for the Federal Circuit also has stated that:

> Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct.Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed.Cir.1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl.Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed.Cir.1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct.Cl. 69. . . .

Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d at 958–59; see also Galen Medical Assocs., Inc. v. United States, 369 F.3d at 1330; Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995; Grumman Data Sys. Corp. v. Widnall, 15 F.3d at 1046.

The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. See Compubahn v. United States, 33 Fed.Cl. 677, 682–83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted). As noted above, the question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but rather, whether the conclusions reached by the agency lacked a reasonable basis and were, therefore, arbitrary or capricious.

To prevail in a bid protest case, the protester must not only show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Recognizing the two-step analysis of bid protest cases, the Federal Circuit recently stated that:

> A bid protest proceeds in two steps. First . . . the trial court determines wheth-

er the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second ... if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

*Bannum, Inc. v. United States,* 404 F.3d at 1351. In describing the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data General,* 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica,* 102 F.3d at 1582; *see CACI, Inc.–Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration.'") (citation omitted).

*Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.), *reh'g denied* (1999) (citation omitted in original); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1330; *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319; *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370 (Fed.Cir. 2002); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33; *OMV Med., Inc. v. United States,* 219 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1057; *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1380 (Fed.Cir.2000).

In *Data General Corporation v. Johnson,* the United States Court of Appeals for the Federal Circuit wrote:

We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract .... The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

*Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996); *see also Bannum, Inc. v. United States,* 404 F.3d at 1358 ("To establish prejudice Bannum [the plaintiff] was required to show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors in the bid process." (quoting *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319; *Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367; and *Statistica, Inc. v. Christopher,* 102 F.3d at 1582)).

*Integrity of the Procurement Process*

The Procurement Integrity Act states that: "A person shall not, other than as provided by law, knowingly obtain contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 423(b) (2000); *see also Naplesyacht.com, Inc. v. United States,* 60 Fed.Cl. at 472 n. 9 (citing 41 U.S.C. § 423(a)(1) for its prohibition on government officials disclosing "contractor bid or proposal information or source selection information.") The Procurement Integrity Act defines contractor bid or proposal information as "cost or pricing data," "indirect costs and direct labor rates," "[p]roprietary information about manufacturing processes, operations, or techniques marked by the contractor in accordance with applicable law or regulation," or "information marked by the contractor as 'contractor bid or pro-

posal information, in accordance with applicable law or regulation.'" 41 U.S.C. § 423(f)(1)(A-D).

Recognizing the disadvantage to a contractor whose protected information is exploited by its competitors, Congress did not limit remedies to Procurement Integrity Act violations only to overturning procurement decisions or excluding particular contractors. The act enforces the prohibition of releasing protected information by placing criminal sanctions on potential violators, including up to five years in prison, thereby emphasizing the importance of maintaining the integrity in government contracting. *See* 41 U.S.C § 423(e)(1)(b); *Cent. Ark. Maint., Inc. v. United States*, 68 F.3d 1338, 1343 (Fed.Cir. 1995) ("The government has substantial administrative, civil, and criminal enforcement authority under the Procurement Integrity Act to police the procurement process.").

Plaintiff relies on the case of *McDonnell Douglas Corporation v. Department of the Air Force*, 375 F.3d 1182, 1185 (D.C.Cir.), *reh'g and reh'g en banc denied* (2004), a Freedom of Information Act (FOIA) case, in which the Air Force intended to release to a competitor McDonnell Douglas' pricing information, which had been incorporated into an Air Force contract. Lockheed Martin had asked the Air Force for a copy of the McDonnell Douglas contract pursuant to the FOIA, 5 U.S.C. § 551 *et seq. Id.* McDonnell Douglas objected to the release of its option year prices, the costs of materials and services procured from other venders, and the hourly rates it charged the Air Force for work not required under the contract, and filed suit to protect its data. *Id.* at 1186. The United States Court of Appeals for the District of Columbia Circuit found that disclosure of the option year prices would likely cause McDonnell Douglas substantial competitive harm, "by informing the bids of its rivals in the event the contract is rebid." *Id.* at 1190 (footnote omitted). Similarly, release of McDonnell Douglas' costs of materials and services procured from other venders was determined likely also to cause substantial competitive harm. *Id.* at 1191. However, the rates McDonnell Douglas charged the Air Force for other work were releasable,

because there was no evidence that a competitor would be able to derive pricing factors from the figures. *Id.* at 1192.

Plaintiff also relies on *Compliance Corporation v. United States*, 22 Cl.Ct. 193 (1990), *aff'd*, 960 F.2d 157 (Fed.Cir.1992) (table), in which Compliance had been disqualified from the bidding process in a Navy procurement and sought injunctive relief in the United States Claims Court. *Id.* at 194. Compliance employees had asked employees of the incumbent, which also was bidding on the new solicitation, for information concerning the incumbent's current contract, and the incumbent's bid proposal on the new solicitation. The data request included salary data, employee benefits, government furnished property, the names, telephone numbers and position descriptions of the incumbent's employees, whether any of incumbent's employees were interested in working for Compliance if it won the contract, and the incumbent's bid proposal. *Id.* at 195. The Navy disqualified Compliance for obtaining or attempting to obtain proprietary proposal information from the incumbent, in order "to protect the integrity of the procurement process." *Id.* at 196. Compliance filed a protest with the Government Accountability Office (GAO), which was denied. The GAO stated that it had jurisdiction to review the reasonableness of the contracting officer's decision to disqualify Compliance, and denied the protest based on the contracting officer's rationale. *Id.* at 196–97. The Claims Court upheld the contracting officer's disqualification decision in *Compliance*, terming the contracting officer's decision one which was taken with the purpose of protecting the procurement process, and a judgment call which was presumed to be made in good faith, and as to which the court would not substitute its judgment. *Id.* at 203–04.

The defendant and intervenor rely on *Synetics, Inc. v. United States*, 45 Fed.Cl. 1 (1999). In *Synetics*, as in the present case, the incumbent contractor raised the Procurement Integrity Act, alleging that a competitor and intervenor had obtained from the incumbent's employees various personnel information such as salaries, bonuses, posi-

tions, background, and availability, as well as a so-called "keepers list" from the incumbent's deputy program manager, which consisted of the names and positions of twenty-eight employees of the incumbent and an opinion of their work habits and qualifications. *Id.* at 14. The court in *Synetics* found no violation of the Procurement Integrity Act, concluding that the compensation information did not meet the definition of contractor bid or proposal information, that the information in the "keepers list" appeared to have been generally available, and that the incumbent's confidentiality agreement did not prohibit disclosure of the information. *Id.* at 14 (citing *Textron Marine Sys.*, B–255580.3, 94–2 CPD ¶ 63, 1994 WL 424686 (Comp.Gen. Aug. 2, 1994) (finding that compilation of names, positions, and experience of incumbent contractor's employees was not proprietary information) and *RAMCOR Servs. Group, Inc.*, B–253714, 93–2 CPD ¶ 213, 1993 WL 409526 (Comp.Gen. Oct. 7, 1993) (finding that list of names and telephone numbers of incumbent's employees was not proprietary information)); *see also Rothe Dev., Inc.*, B–279839, 98–2 CPD ¶ 31, 1998 WL 421799, at *3 (Comp.Gen. July 27, 1998) (the number of incumbent's employees working on the contract was not considered proprietary; furthermore, "the information disclosed did not reveal what labor categories, mix, or rates would be appropriate, or how Rothe calculated its profit, overhead, and management costs—important elements of price and in some instances, technical approach.").

While the *Compliance* and *Synetics* cases are noteworthy in this area of law, their relevance to the present case is that they establish a framework for deciding the legal issues based upon a case specific, fact-by-fact inquiry which takes into account both the quality and specificity of facts. The determination of whether the decision not to disqualify King and the subsequent award decision were arbitrary and capricious may vary, depending on the particular facts of the case under review. *See Compliance Corp. v. United States*, 22 Cl.Ct. at 205 (noting that the contracting officer's disqualification will vary based on the facts in each case).

The *Compliance* and *Synetics* cases also provide guidance on establishing the standard of review the court applies to decisions of the agency and contracting officer. The court's equitable powers should be applied to best minimize "judicial interference in contract procurement." *Synetics, Inc. v. United States*, 45 Fed.Cl. at 5 (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983)). Courts provide wide discretion to government departments and agencies concerning the technical adequacy of bid proposals, evaluation of bids, and application of procurement regulations, in deciding whether the agency's decision had a reasonable basis. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d at 1332; *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed.Cl. 303, 320 (2000) (citing *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. 34, 42 (1997)). Furthermore, when a court does "review technical matters that are within the agency's expertise, the highest degree of deference is warranted." *See Bean Stuyvesant, L.L.C. v. United States*, 48 Fed.Cl. at 320 (quoting *Cubic Defense Sys., Inc. v. United States*, 45 Fed.Cl. 450, 458 (1999) (citing *G.E. Gov't Servs., Inc. v. United States*, 788 F.Supp. 581, 590 (D.D.C.1992))). This wide discretion is provided by the court in light of the presumption that government officials are held to high expectations in acting correctly, honestly, and with good faith when evaluating bids. *See Bean Stuyvesant, L.L.C. v. United States*, 48 Fed.Cl. at 320 (citing *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. at 42). Therefore, the court must not substitute its own judgment for that of the agency or contracting officer provided that decision is founded on a reasonable basis, even if reasonable minds might reach different results. *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied*, 420 U.S. 956, 95 S.Ct. 1340 (1975); *Consolidated Eng'g Servs., Inc. v. United States*, 64 Fed.Cl. 617, 623 (2005); *Synetics, Inc. v. United States*, 45 Fed.Cl. at 5; *CRC Marine Servs., Inc. v. United States*, 41 Fed.Cl. 66, 83 (1998); *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. at 42.

The GAO has stated that "the responsibility for determining to what extent a firm should be excluded from the competition rests with the procuring agency, and we will overturn such a determination only when it is shown to be unreasonable." *Textron Marine Sys.*, 1994 WL 424686, at *8. The first step in the court's analysis is to examine the nature of the information obtained by King, in order to determine if the information is "clearly the type of information usually considered to afford an unfair competitive advantage." *Id.* (In *Textron Marine Systems,* the GAO found that the incumbent contractor's information, which had been obtained by the awardee, was not the type of information which afforded an unfair competitive advantage to the awardee.).

FAR 3.104–4(a) prohibits disclosure of contractor bid or proposal or source selection information unless one of the listed exceptions applies. Under the Freedom of Information Act (FOIA), government agencies are obligated to make information available to the public, unless one of the listed exceptions applies. *See* 5 U.S.C. § 552(a), (b) (2000). Once information enters the public domain, however, it is no longer confidential and parties may not make claims of confidentiality regarding such information. In *R & W Flammann GmbH v. United States,* 339 F.3d 1320 (Fed.Cir.2003), the Army disclosed incumbent bidder Flammann's unit price information to SKE GmbH, a competitor. *Id.* at 1322. SKE had previously made FOIA requests for Flammann's incumbent contract cost schedule, to which Flamman objected. *Id.* After rejection of its pre-award bid protest, Flammann claimed that the Army's disclosure violated the FOIA and the Trade Secrets Act. *Id.* The United States Court of Appeals for the Federal Circuit concluded that Flammann's unit price information was in the public domain, since the information, which was included in the contract, had been made public as a result of the bid opening process. *Id.* at 1323. Because the information was already publicly available, the court approved its release to SKE. *Id.* Therefore, the court found that the Army did not violate the FOIA or the Trade Secrets Act. *Id.; see also CNA Fin. Corp. v. Donovan,* 830 F.2d 1132, 1154 (D.C.Cir.1987) (noting that if information is in the public domain, the submitter is unable to claim confidentiality), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1270, 99 L.Ed.2d 481 (1988).

A claim that disclosure might result in a competitive advantage or disadvantage also is contingent upon whether the information or material sought to be protected is stale. In general, although largely a fact and case-specific inquiry, information loses its confidential nature once it becomes stale. *See United States v. Int'l Bus. Machs. Corp.,* 67 F.R.D. 40, 49 (S.D.N.Y.1975) (holding that five-year-old information in that case was stale); *Rosenblatt v. Northwest Airlines, Inc.,* 54 F.R.D. 21, 23 (S.D.N.Y.1971) (holding that the need for the court's protection was diminished because the information sought to be protected was one year old); *Hecht v. Pro–Football, Inc.,* 46 F.R.D. 605, 605 (D.D.C.1969) (finding that information up to three years old was confidential and entitled to protection); *United States v. Lever Bros. Co.,* 193 F.Supp. 254, 255–56 (S.D.N.Y.1961) (finding that information three to eight years old should not be protected), *cert. denied,* 371 U.S. 932, 83 S.Ct. 310, 9 L.Ed.2d 272 (1962); *cf. Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 529 F.Supp. 866, 891–92 (E.D.Pa. 1981). In the above-noted *International Business Machines* case, the non-party deponent corporation objected to the public disclosure of its profits data for certain computer systems, products, and services, arguing that disclosure would place the deponent at a competitive disadvantage. *See United States v. Int'l Bus. Machs. Corp.,* 67 F.R.D. at 48. However, the United States District Court for the Southern District of New York disagreed, stating that, "[t]o reveal any of this information would not erode the cornerstone of [deponent's] competitive foundation." *Id.* at 49. The court's reasoning was that the report at issue revealed little if anything about the contemporary operations of the corporation and was five years old, too old to be of value to a competitor. *Id.* With this foundation, the thirty-four specific information segments about which the plaintiff complains, will be reviewed below.

*Disqualification*

### 1. Working Conditions, Pay, and Other Details of Deployments

■ Avtel argues that Avtel employee Donald Wilbanks provided King with information regarding working conditions, pay, and other Dash 7 deployment specifics. According to King employee Keith Weaver's meeting notes, Mr. Wilbanks informed King that: "The employees are paid for [deleted] hours per week when in Columbia [sic] for a [deleted] day work week. They are given one of their days off with pay as a [deleted]. They work [deleted] hour shifts when on deployment. Past deployments have kept 8 employees in Columbia [sic] that get rotated [deleted] off at the halfway point of deployment.... There is a [deleted] pay differential for when employees are on deployment." Avtel argues that this information rises to the level of competition sensitive information because it details Avtel's specific execution of the contract requirements.

In his December 8, 2004 decision, the Army's contracting officer, Mr. Krahl, stated that information on the working conditions, pay, and other deployment details are publicly available through the contract documents and, therefore, did not provide King with an unfair competitive advantage. Specifically, the contracting officer cited several sections of the solicitation's Statement of Work that describe the deployment requirements, the pay differential while deployed, and the government's responsibility to provide all information regarding available equipment, support, and facilities.

The government and defendant-intervenor King similarly argue in this case that deployment information is in the public domain. The government claims that several relevant answers to questions from offerors were available on a government web site at https://army-aviation-systems.redstone.army.mil/4fw04/, thus placing the information in the public domain. King further argues that an abundance of detailed deployment site setup information is available on the internet at www.jiatfs.southcom.mil/j4, regarding the Apiay, Colombia site. In addition, King asserts that Henrietta Maples' Naval Postgraduate School thesis, titled "Contractors on the Battlefield: A Case Study of the Airborne Reconnaissance Low (ARL) Life–Cycle Logistics Support Contract—March 2000 through August 2001," provided deployment information and, because the thesis is available on the internet, the information it contains also is within the public domain. Information presented in Ms. Maples' thesis includes personnel turnover and its causes, the requirement for a 15 percent pay differential while deployed to hostile areas, duty time, beddown base information, and deployment conditions. The 1999 contract awarded to Avtel, which King obtained under the FOIA, also provides information about the detailed requirements of deployment personnel.

Avtel argues that the Wilbanks disclosure that Avtel pays a 15 percent hostile area pay differential is proprietary information. Avtel appears to believe that the 15 percent hostile pay differential is at the discretion of the contractor, citing the Maples thesis, which stated: "The 'hostile area' differential amounts to 15 percent (15%) of the employee's yearly salary for the duration of such travel and work assignment in the designated hostile area. The Government cannot direct the contractor's corporate headquarters to pay these individuals higher wages during deployments or even mandate that they pay deployment bonuses. It would seem a prudent contractor strategy to take care of their personnel ...." Believing the pay differential to be discretionary, Avtel argues that the fact that it pays the differential is proprietary. Avtel is mistaken.

The Statement of Work for the 2004 Dash 7 solicitation, at section 3.12.5, "Hostile Area Differential," states that:

> In the event an employee is required to travel and work in a hostile area as defined by the U.S. State Department, a hostile area differential outlined in Title 37, chapter 5, Section 310 U.S.Code or current hostile location shall be paid at the percentage authorized. Differential shall be paid towards base salary for the duration of such travel and work assignment in designated hostile area. Differential pay shall be included in the O & A [Over and

Above] work request associated with the work effort supporting the assigned mission.

This solicitation language takes the discretion out of whether a contractor will pay the hostile area pay differential, and is consistent with the Maples thesis, which states: "The contract contains a Hazardous Pay clause. In the event an employee is required to travel to and work in a hostile area, the contractor is required to pay at the percentage authorized a hostile area differential . . . ." The Maples thesis later notes that other, additional wages or bonuses may be paid at the contractor's discretion, and encourages such additional pay. But the hostile area pay differential is required by the contract, as is discussed in the publicly available Maples thesis. Therefore, Mr. Wilbanks' disclosures about the pay differential on deployment provided King with no competitive advantage. Furthermore, the disclosure of employee compensation has not typically been considered contractor bid or proposal information. *See Synetics, Inc. v. United States,* 45 Fed.Cl. at 14–15 (finding that the release of compensation information did not violate the Procurement Integrity Act, 41 U.S.C. § 423(b)).

The parties identify five primary information sources which discuss working conditions, pay, and other deployment details: the internet, the solicitation's Statement of Work, Ms. Maples' Naval Postgraduate School thesis, Avtel's 1999 contract, and King's meeting with Donald Wilbanks, an Avtel employee. As noted earlier, information available on the internet is within the public domain, since it is available to anyone who has access to a computer with internet capability. Likewise, information contained in the Statement of Work, which was included in the solicitation and released to the public on May 14, 2004, also is in the public domain. The Maples thesis was approved for public release with unlimited distribution and, therefore, also was in the public domain, a topic discussed further below. Moreover, information contained in the 1999 Army contract awarded to Avtel, which also is discussed more extensively below, including detailed requirements of deployment personnel,

has been made public as a result of the bid opening process and contract award. *See R & W Flammann GmbH v. United States,* 339 F.3d at 1323 ("[T]he incumbent contract's bids were publicly opened and became immediately available to the public . . . . When a sealed bid is available to the public, whether or not it is consulted, it enters the public domain . . . .").

Not only was extensive deployment information already in the public domain, but Avtel also has not demonstrated to the court that disclosure of information claimed to be sensitive would cause Avtel to suffer substantial competitive harm. *See Martin Marietta Corp. v. Dalton,* 974 F.Supp. 37, 41 (D.D.C. 1997) (holding that release of contractor's alleged proprietary information was proper since the contractor failed to demonstrate that such release would result in substantial competitive harm). The court concludes, therefore, that the deployment information was in the public domain, and the information provided by Mr. Wilbanks, and largely available from numerous other sources, affords King no unfair competitive advantage. Based on the information available in the public domain to all bidders concerning the working conditions, pay, and other details of deployment, combined with plaintiff's failure to demonstrate competitive harm, this court finds that the contracting officer's decision not to disqualify King based on this information had a reasonable basis.

*2. Flying Hour Average*

■ Avtel argues that the flying hour average information King sought and obtained from Mr. Wilbanks was proprietary. According to Keith Weaver's meeting notes, Mr. Wilbanks informed King that the "[f]lying hours per the solicitation are predicated by the government to be 160 hours per plane per month (120 hrs missions and 40 hours training)." The meeting notes further indicate: "The program has [deleted]. In fact December with holidays and down time the planes only flew [deleted]." According to Mr. Weaver, Mr. Wilbanks further indicated that: "Flying schedules in El Paso are prepared and always changing based on the Army's needs." Avtel asserts that this sort

of information is not found in the contract documents.

In his final decision, the contracting officer concluded that flying hour averages were publicly available through the contract documents. Specifically, the contracting officer stated that: "Contract Line (CLIN) 0002AA, page 6 of the solicitation gives an estimate of 8801 flying hours." In addition, the contracting officer found that Appendix G of the solicitation contained a two-year history of flying hours broken down by aircraft and by month. Both of these sources of information are in the public domain because they were attached to the solicitation, a public document available to all bidders.

The government and defendant-intervenor King also argue that flying hour information is in the public domain. The government noted that a question from a prospective offeror, provided on the internet and referred to in an amendment to the May, 2004 solicitation, projected the monthly average flying hours to be 81.5 hours per aircraft. King notes that the 1999 Avtel contract, obtained under the FOIA, provides a flying hours estimate of 160 hours per aircraft per month, but that actual flying hours are less than 160 hours per month, as disclosed in public documents. The Maples thesis discloses that "due to a shortage of ARL pilots and the long lead-times associated with applying the aircraft/PME modifications," the government-estimated flying hours were not met. Additionally, the flying hour history found in the solicitation reveals that fewer than 160 hours per month were achieved. As discussed above, all of the information King obtained from the 1999 Avtel contract, the Maples thesis, and the internet are within the public domain.

Information King obtained from Mr. Wilbanks regarding flying hour averages is found within the public domain. The monthly flying hour average of 160 hours was stated, not only by Mr. Wilbanks during his meeting with King, but in the 1999 Avtel contract and the Maples thesis. Additionally, the Maples thesis states, "these flying hours have not materialized at Fort Bliss," which is similar to Mr. Wilbanks' comment that the program has never accomplished 160

flying hours per plane per month and that the flying schedules are constantly changing. In addition, the Statement of Work contains actual flying hour history, which can be calculated to arrive at a flying hour average. Thus, information obtained from Mr. Wilbanks was either the same or substantially similar to information that could be found in the publicly available documents. Furthermore, Avtel has not demonstrated competitive harm by the disclosure of flying hour information. *See Martin Marietta Corp. v. Dalton*, 974 F.Supp. at 41 (release of contractor's information was allowed because contractor did not demonstrate that such release would result in substantial competitive harm). For these reasons, the court finds that the contracting officer's decision not to disqualify King based on disclosure of this sort of information had a reasonable basis.

### 3. Aircraft Painting and Washing

■ Mr. Wilbanks informed King that, "Currently the aircraft get painted every [deleted] years. They generally get painted at the Mohave location . . . ." Avtel argues that the information King obtained from Mr. Wilbanks regarding aircraft painting and washing is competition-sensitive. The contracting officer determined that the aircraft painting and washing information is publicly available through the contract documents, particularly the solicitation and Statement of Work. The government and King similarly agree that the information is in the public domain.

The court finds that information regarding aircraft painting and washing was in the public domain and King was not provided with an unfair advantage in this regard. First, the publicly available solicitation, at CLIN 0006AA, provides a yearly estimate of three aircraft strip and repaints per year, as well as items to include in the price for the strip and repaint of the aircraft. Additionally, the solicitation's Statement of Work contains a section titled "Painting of Aircraft," which describes the contractor's responsibility for aircraft painting, as well as a section titled "Aircraft Cleaning," which provides aircraft washing requirements. A response to a question from an offeror, provided on a public web site and referred to in an amend-

ment to the May, 2004 solicitation, also states that aircraft must be painted every three years. Additional information about the scope of the work required, quantities, and prices are located in the 1999 Avtel contract obtained under the FOIA. Through the publicly available Statement of Work, King, or any other offeror, could have learned that each aircraft would be painted every three years. The only additional information provided by Mr. Wilbanks regards the Mohave location where Avtel painted its aircraft. Avtel, however, has not demonstrated to the court how this information provided King with any competitive advantage. The court finds that information on aircraft painting and washing was in the public domain and the contracting officer had a reasonable basis for his non-disqualification decision on this item.

### 4. Current Staffing Level

█ Avtel argues that Mr. Wilbanks inappropriately disclosed the actual number of employees Avtel maintained at the job sites. Avtel argues, for example, that through Mr. Wilbanks, King learned that, although the contract requires a minimum of 24 employees at Fort Bliss, Avtel is "understaffed with 22 people." Keith Weaver's notes on the meeting with Mr. Wilbanks further state: "The next contract will require a minimum of 35 [employees]. [Mr. Wilbanks'] suggestion is that the contractor should bid at least 40."

In his contracting officer's final decision, Mr. Krahl found that information on Avtel's current staffing levels was publicly available through the contract documents. To reach his conclusion, Mr. Krahl referred to the contract's Statement of Work, paragraph 3.12, which states that "[t]he minimum manning level for each BB [beddown base] shall be no less than four (4) maintenance technicians per assigned aircraft." The contracting officer also relied on Avtel's Monthly Maintenance Report to determine that Avtel's staffing level was publicly available. According to the documents in the Administrative Record, including a Monthly Maintenance Report from October, 2004, the report lists the number of employees per site, and neither the report nor any information in the report was marked as proprietary.

The government and King also contend that current staffing level data is available in the public domain. King asserts that, in addition to the requirement in the May, 2004 solicitation for a minimum of four maintenance technicians per aircraft, the Maples thesis lists the staffing levels as 24 technicians for Ft. Bliss and 20 technicians for Camp Humphreys. In addition, at each site, there would be a site manager as well as inventory and quality control inspectors. King argues that another method for estimating the current staffing level is through physical observation provided by the solicitation at clause H–22, "Site Visits," which permits prospective bidders to undertake a site visit. King further claims that information about the number of employees maintained at each site was available on Avtel Services' and Telford Aviation's web sites, until that information was removed at some point after March 4, 2005. Finally, King notes that Mr. Wilbanks never disclosed the number of employees upon which Avtel based its latest proposal.

The court finds no issue with the contracting officer's finding that much of the information on current staffing levels can be found in the public domain through the contracting documents, the Maples thesis, and on the internet. Likewise, site visits during Avtel's tenure would have revealed to King or any other offeror the current number of Avtel employees, or a close approximation thereof, at each site. In addition, the Government Accountability Office has held in a bid protest that the number of incumbent employees was not proprietary. *See Rothe Dev., Inc.*, 1998 WL 421799, at *3 (the number of incumbent contractor's employees did not reveal the contractor's important pricing information and was not proprietary). The contracting officer's conclusion that disclosure of staffing levels did not represent a basis for King's disqualification was, therefore, reasonable.

### 5. Government Furnished Equipment

█ Keith Weaver's notes indicate that Mr. Wilbanks observed:

Most all equipment is furnished. Avtel has between [deleted] that is Avtel property that it bought to support the program. The Government owned inventory is about $12 mil for Ft Bliss and $6 mil for Korea. The program includes 9 spare engines. Don felt the Government does a great job of funding for all equipment that is required for the ARL program in Ft Bliss. Contractor is responsible for the upkeep of Ground Support Equipment under CLIN 2.

Avtel argues that this information is proprietary and competition sensitive.

The contracting officer's final decision found that information on government furnished equipment was in the public domain because it is provided in the contract documents. Specifically, the contracting officer identified Appendix F to the Statement of Work, which contains an inventory of government furnished property under the contract. As the "Government Property" section of the Statement of Work explains, "[s]pecial tools and equipment required to perform both scheduled and unscheduled maintenance, when not issued as G.P. [government property], shall be provided by the contractor." The contracting officer, therefore, concluded that when equipment is needed, but not listed in Appendix F, the contractor is responsible for providing the item.

The government similarly argues that information on government furnished equipment was in the public domain. The government states that, in addition to the information provided in the contract documents, several questions from offerors, responded to in contract modifications on the internet, addressed whether the current levels of government furnished equipment inventory would be replenished before the new contract was awarded. King agrees with the government and the contracting officer's decision and includes other sources in support of its assertion that information on government furnished equipment was in the public domain, and notes that clause H–22 of the May, 2004 solicitation, which permits prospective offerors to perform site visits, during which they may review the government furnished property

list. King further argues that the amount of money Avtel spent to furnish equipment for the contract, [deleted] per flying hour ([deleted] Avtel spent divided by 13,940.8 flying hours, taken from Appendix G of the solicitation), is an insignificant amount and of no competitive value to King.

This court finds that the information King Aerospace obtained from Mr. Wilbanks is not proprietary because data on government furnished property is included in the Statement of Work, a publicly available document. Mr. Wilbanks provided, not a concrete amount, but a general price range that Avtel apparently had expended to buy equipment and parts not furnished by the government. This price range was vague and not precise enough to be sufficiently useful to provide a competitive advantage to a potential offeror such as King in formulating its price proposal. Mr. Wilbanks did not provide King with a list of Avtel furnished equipment, and Avtel has not demonstrated how the general information Wilbanks divulged provided King with any competitive advantage. The contracting officer's decision not to disqualify King on this item, therefore, had a reasonable basis.

### 6. Tooling or Equipment Lacking

■ According to Mr. Weaver's notes, Mr. Wilbanks generally indicated that: "the government does an excellent job of rapidly supporting all equipment required for this program. He believes there is no readily identifiable missing equipment." Avtel argues that this information is competition sensitive, and argues that only the incumbent contractor possesses the relevant information on contractor furnished tooling or equipment. In his December 8, 2004 decision, the contracting officer stated that information on tooling or equipment needs is publicly available through the contract documents and does not meet the definition of contractor bid or proposal information. The Statement of Work at paragraph 3.4.3 states that any tooling or equipment that is needed, but not provided by the government must be provided by the contractor. Using this information in conjunction with Appendix F to the Statement of Work, which lists govern-

ment-furnished items, the contracting officer concluded that the contractor is responsible for providing any needed item that is not listed in Appendix F.

Similarly, the government and King allege that the information on tooling or equipment needs is in the public domain. In addition to the information found in the contract documents, the government asserts that answers to offerors' questions, previously on the internet, stated that the contractor is responsible for buying needed equipment not provided by the government and that the incumbent contractor must bring unserviceable property into serviceable condition prior to the beginning of the new contract. King cites to additional paragraphs in the Statement of Work, requiring the contractor to maintain all Ground Support Equipment in serviceable condition and address any shortcomings in equipment or inventory during the phase-out of the predecessor contractor.

The bulk of information on tooling or equipment is found in publicly available documents. Mr. Wilbanks did not identify any missing equipment for the old Dash 7 contract, and did not address tooling or equipment needs for the current contract, with its different requirements. Moreover, on a site visit permitted by the Site Visit clause in the solicitation, H–22, King would be able to observe the equipment and tools currently at the site and compare the inventory with the list of government furnished property contained in Appendix F of the Statement of Work, to determine equipment and tooling needs, if any. The court concludes that the information King obtained from Mr. Wilbanks did not give a competitive advantage to King, and that the contracting officer's decision not to disqualify King based on this item had a reasonable basis.

### 7. Vehicle Needs

■ According to Mr. Weaver's notes, Mr. Wilbanks stated that: "[deleted]." Avtel believes this information to be competition sensitive. Avtel argues that a site visit would have only informed on how many vehicles were in use under the old contract, not whether more vehicles were needed, and not whether to factor in contingency pricing for vehicle needs.

On the issue of vehicles needed for the contract, the contracting officer reasoned that, "[a]s with all government furnished property, if it is not listed on Appendix F [of the solicitation], then the contractor should plan on providing the property themselves." Additionally, the contracting officer concluded that offerors could easily observe vehicles during a site visit to the primary beddown base. King adds that "[g]overnment vehicles are easily distinguishable by their government license plates." The contracting officer also found that information on vehicle needs did not fit the definition of contractor bid or proposal information which would assist an offeror and that such information was in the public domain. The government and King agree, and state that public information in the Statement of Work provided a basis for the contracting officer's conclusions.

Avtel has not demonstrated that vehicle needs being furnished by the government on the prior Dash 7 contract, or in this case, the absence of additional vehicle needs, provided King an unfair advantage on the new solicitation, which had different requirements compared to the 1999 Dash 7 Contract. Because the vehicle information was provided in the contract documents and any further need for contractor vehicles could have been identified through observing contractor vehicles during a site visit, and also because the record does not reflect that King relied on the information for the new solicitation, with new requirements, the contracting officer's conclusion not to disqualify King for this reason had a reasonable basis.

### 8. Role and Location of Program Management Office

■ According to Mr. Weaver's meeting notes, Mr. Wilbanks indicated that Avtel's Program Manager and the Program Management Office were located in the [deleted] area. Avtel labeled this information competition sensitive and argued that the sensitivity was based on information Mr. Weaver sought as to why the program manager was located in [deleted]. According to the plaintiff, through Mr. Wilbanks, King learned that

there is no hard and fast reason to have the program office in [deleted]. Avtel argues that this information was not in the public domain, but that King learned that it would not be required to maintain the office in [deleted] and incur related costs. The contracting officer's final decision notes that the role of the Program Manager is found in the 1999 Dash 7 contract under the section on key personnel. The information also is contained in the 2004 Dash 7 solicitation. Furthermore, as the contracting officer's final decision notes, the name and location of the Program Manager and his office can be found on the internet. In addition, the location of the Avtel Program Management Office is found in the publicly available Maples thesis.

King argues that even without the information from Mr. Wilbanks, the conclusion that maintaining the [deleted] Program Management Office is not a requirement is determinable. Publicly available information makes clear that [deleted] is not a Forward Operating Location (FOL), Forward Operating Station (FOS), Army contracting office, or Avtel repair station. Therefore, one could deduce from this information that the [deleted] site is not one the contractor would be required to preserve.

Knowledge about why the Program Management Office is located in [deleted] would not confer a competitive advantage on King because maintaining a site, whether in [deleted] or any other location, required King to factor those expenses into its proposal cost. Furthermore, once information enters the public domain, it is no longer proprietary. *See CNA Fin. Corp. v. Donovan,* 830 F.2d at 1154. For these reasons, information on the role and location of Avtel's Program Management Office in [deleted] is not competition sensitive, and the contracting officer had a reasonable basis for not disqualifying King on this basis.

### 9. *Number of Employees Required in Avtel's Program Office*

██ According to Mr. Weaver's meeting notes, Mr. Wilbanks indicated that there were currently [deleted] people working in the [deleted] Program Office in the following areas: [deleted]. Avtel argues that the integrity of the procurement was impaired, and that by learning the number and type of personnel Avtel maintained in its Program Office, King gains insight into Avtel's management and an approximation of the related costs.

In his final decision, the contracting officer concluded that knowing the number of employees required in Avtel's Program Office "would not impair the integrity of the procurement." He relied on *Arctic Slope World Services, Inc.*, which stated, "There is nothing improper in releasing information on the number of personnel performing an incumbent contract." *Arctic Slope World Servs., Inc.,* B–284481, B–284481.2, 2000 CPD ¶ 75, 2000 WL 675594, at *3 (Comp.Gen. Apr. 27, 2000) (citing *Rothe Dev., Inc.,* 1998 WL 421799, at *3).

The government and King add that the type of employees needed in the Program Management Office can be inferred from the solicitation. The government and King note that the Statement of Work in the 2004 Dash 7 solicitation, for example, provides the roles and requirements of key personnel, including the program manager and contract manager. King also notes that the contract clauses at FAR 52.222–41 (Service Contract Act), 52.232–1 (Payments), and 52.232–7 (Payments under Time–and–Materials and Labor–Hour Contracts), require contractor financial support personnel. The 2004 Dash 7 solicitation contemplates contractor logistics support personnel, further identifying the types of personnel required in the program office. Finally, all offerors were permitted to participate in a site visit, which would reveal through observation the number of employees working at the Program Office. In other words, an offeror could infer from the available public documents that procurement, logistics, and finance personnel are needed in addition to a program manager and observe through a site visit the number of personnel working at the site. The general information disclosed did not rise to the level of competition sensitive information, and the contracting officer had a reasonable basis for not disqualifying King on this basis.

**10. Difficulty in Maintaining Mission Capable Shipping Rates**

 According to Keith Weaver's meeting notes, Mr. Wilbanks informed King that: "[deleted]." Avtel argues the information Mr. Wilbanks provided was useful for King's pricing decisions.

The contracting officer concluded, however, that the difficulty in maintaining mission capable rates is publicly available in the contract documents. Avtel's 1999 contract, for example, requires an "Aircraft Status Report," which lists all aircraft, indicates if they are Non–Mission Capable (NMC) or Partially Mission Capable (PMC), and the cause of the impact on mission capability. In addition, the Maples thesis contains eighteen months worth of mission capable rates, and factors impacting mission capability including the difficulty of getting aircraft spare and repair parts to deployment sites. King notes that the route for shipping aircraft parts to Colombia, whether through [deleted], is determined by Federal Express, not the shipper, and is available on the Federal Express web site. King also argues that there is abundant information on the internet regarding difficulties a contractor might face in maintaining its mission capable rates in both South America, at the Colombia site, and at Camp Humphreys, in the Republic of Korea.

Mr. Wilbanks' opinion on the mission capable rates added nothing significant to what was already available in the public domain. Nor does an employee's opinion automatically rise to the level of contractor bid or proposal information. *See Synetics Inc. v. United States,* 45 Fed.Cl. at 14; *Textron Marine Sys.,* 1994 WL 424686, at *6, 8. Under these facts and circumstances, the need to get parts to a deployment location does not rise to the level of competition sensitive information. The contracting officer's decision not to disqualify King for this item had a reasonable basis.

**11. Parts Vendors**

 According to Keith Weaver's meeting notes, Mr. Wilbanks indicated that: "[deleted]." Avtel believes that its possession of a good supply of parts is competition sensitive information.

The contracting officer's final decision noted that Dash 7 parts vendors may be obtained on the internet and were, therefore, in the public domain. The contracting officer named specific vendors' web sites, and stated that a search for "DeHavilland Dash 7" on the internet revealed "several parts vendors." The government and King similarly argue that information on parts vendors is within the public domain. King notes that many companies maintain large inventories of aircraft parts and, thus, the fact that Avtel keeps a supply of parts is not unique and does not provide special information to King. Additionally, King argues, "Avtel's inventory is also not relevant because parts are not billable to the Government until they are needed, issued, and installed, under the provisions of FAR 52.232–7 . . . ."

The court does not find that King received a competitive advantage based on the information that [deleted]. DeHavilland is a public commercial vendor and a logical vendor for the DeHavilland Dash 7 (DHC–7) aircraft. Furthermore, according to King's 2004 proposal, King will [deleted]. Nor has Avtel demonstrated that the virtue of generally maintaining a good supply of parts rises to the level of competition sensitive information. The contracting officer had a reasonable basis for not disqualifying King based on this item.

**12. Whether Repair Station Violations Had Occurred**

 According to Keith Weaver's notes, Mr. Wilbanks told King that Avtel's "[deleted]" and that "FAA inspections are no more than a [deleted]." Avtel argues that this information is proprietary. The contracting officer's final decision notes that information on repair station violations is in the public domain, citing the Federal Aviation Agency (FAA) website at *www.faa.gov,* which provides a listing of violations by company, type, and sanction. The contracting officer concluded, therefore, that information on repair station violations was not proprietary. The government and King similarly argue that repair station violation information is not

proprietary and, therefore, could not give King a competitive advantage.

Furthermore, Avtel's relationship with the FAA is not relevant to King's relationship with the FAA at any given time. As King argues, "the relationship Avtel has with the FAA is insignificant to the relationship that King must develop at a new location," and "such information and the length of time the FAA spent inspecting Avtel on a walk-through (brief, by definition) would be of no competitive advantage to King." Plaintiff has not demonstrated that information as to whether or not Avtel had a good relationship with the FAA rises to the level of a competitive advantage. The court concludes that the information provided on the FAA's website regarding any of Avtel's violations is not proprietary and, therefore, did not give King a competitive advantage. The contracting officer's decision not to disqualify King based on this item had a reasonable basis.

### 13. The Strengths and Weaknesses of Avtel and Subcontractors

■ Keith Weaver's notes on King's meeting with Mr. Wilbanks reflect the following questions and answers:

19. Who are the contractors that support the mission equipment? [deleted]

20. What are their strengths and weaknesses? The government is only so/so happy with them. The contract is being ready to be put out to bid. Don feels a *strength* is that they are both good at what they do but there is [delete] that is behind schedule and not working very well that is creating government disappointment. A *weaknesses* [sic] is that they are having trouble getting some new equipment working. (emphasis in original).

Avtel argues that, with such information, King could determine whether "it will need to price for contingencies or additional training in order to circumvent problems the incumbent contractor is currently experiencing." In his December 8, 2004 decision, the contracting officer concluded that information on Avtel's strengths and weaknesses is purely opinion, and not proprietary. To illustrate this conclusion, the contracting offi-

cer gave an example: "what an employee may see as a weakness such as low pay and minimal benefits, management could see as a budgetary strength for the company." Thus, the contracting officer concluded that this information does not meet the definition of contractor bid or proposal information. The government echoed the contracting officer's position that opinions about Avtel's strengths and weaknesses are subjective and not bid or proposal information. Moreover, King contends that information on Avtel's strengths and weaknesses is in the public domain. Avtel's strengths are available in letters from the Army, which were previously posted on Avtel web sites. The Maples thesis, an internet available, public document, also contains criticism of Avtel in meeting mission capable rates, personnel turnover, obsolescence, and Avtel's corporate structure.

The court concludes that an opinion that an Avtel subcontractor is behind schedule on a tasking is neither unique nor sufficiently specific to rise to the level of competition sensitive information. Moreover, the opinion of one employee, which was not even the official corporate position, is not definitive. The contracting officer's decision not to disqualify King based on this item had a reasonable basis.

### 14. Engineering Support

■ According to Keith Weaver's meeting notes, Avtel employee Wilbanks indicated that he received engineering support through "[deleted] for structural and electrical engineering diagrams that are sent for approval to DeHavilland," and that Avtel either performs [deleted] engineering or outsources to DeHavilland. Avtel believes this information to be proprietary.

The contracting officer's final decision concluded that companies offering Dash 7 engineering support are readily available on the internet and, therefore, are in the public domain. The government and King similarly contend that there are a numerous Dash 7 engineering support resources on the internet, including the web site of Bombardier, the parent company of DeHavilland. King

adds that the Maples thesis, which is in the public domain, "[deleted]."

In identifying [deleted] as a quality assurance employee, Mr. Wilbanks did not divulge information generally considered contractor bid or proposal information. *See Synetics, Inc. v. United States,* 45 Fed.Cl. at 4, 14 (finding that information, including the names and positions of twenty-eight employees of the incumbent contractor, obtained by a competitor, did not meet the definition of contractor bid or proposal information, and was not considered proprietary); *Textron Marine Sys.,* 1994 WL 424686, at *8, 10 (finding that information regarding the incumbent's organizational structure and staffing was not proprietary information); *RAM-COR Servs. Group, Inc.,* 1993 WL 409526, at *2–3 (finding that the names and telephone numbers of incumbent contractor's employees were not proprietary information). Furthermore, in naming DeHavilland as Avtel's engineering support resource for the DeHavilland Dash–7 aircraft, Mr. Wilbanks did not confer on King a competitive advantage. Knowledge of the availability of the original equipment manufacturer, DeHavilland, for engineering support is easily available on the internet. According to King's 2004 proposal, King [deleted]. Under these facts and circumstances, Avtel's use of DeHavilland, the OEM, does not rise to the level of competition sensitive information. The fact that Avtel either performs work [deleted] or outsources it, without further detail, is unremarkable, and similarly confers no competitive advantage on King, The contracting officer's decision not to disqualify King for this item had a reasonable basis.

15. *Annual Audit on Parts and Equipment*

■■■ According to Keith Weaver's meeting notes, Mr. Wilbanks indicated that a local contractor performs Avtel's parts and equipment inventory and the government performs an annual audit. Mr. Wilbanks also mentioned that "[deleted]." Avtel argues that this information shows King how the system "actually works" and is proprietary.

The contracting officer's final decision concluded that annual audit information is pub-

licly available through the contract documents. Specifically, the contracting officer cited to the CDRL (Contract Data Requirements List) A001, the "Status of Government Furnished Equipment Report," stating that it provided the update on parts and equipment. The government also notes that Appendix F to the Statement of Work contains the inventory of government supplied equipment. To support its contention that annual audit information is in the public domain, King cites to FAR 45.508, "Physical Inventories" which provides for periodic contractor inventories of government property. King also cites to another public document, the "DoD Manual for the Performance of Contract Property Administration," DoD 4161.2–M, at 60–65. This DoD Manual states that: "Often, contractors will hire a separate company, such as special service firms, to do the inventory." In addition, King notes that using a local inventory firm is not a significant cost and is not a requirement of the contract.

The DoD Manual for the Performance of Contract Property Administration indicates that it is common for contractors to utilize special service firms to conduct parts inventories, and that hiring an outside firm "has proven to be a very effective method," thereby encouraging the use of outside firms. Because the use of an outside contractor is not only common, but encouraged by the military, the fact that Avtel's audits are performed by an inventory-taking firm instead of Avtel personnel is unremarkable and does not rise to the level of contractor bid or proposal information that would provide King a competitive advantage. The court finds that the contracting officer's decision not to disqualify King based on this item had a reasonable basis.

16. *Insurance*

■■■ According to Keith Weaver's meeting notes, Mr. Wilbanks told King that Avtel's employees were not happy with their employee insurance. Mr. Wilbanks had commented that there was no life insurance coverage on deployments, that dental coverage was "poor," and that the disability insurance company was "slow to pay benefits." The health insurance, for which families paid Blue

Cross & Blue Shield [deleted] per month on an [deleted] per month premium, "does not provide great coverage." Avtel contends that with this information, King would be able to negotiate cheaper insurance.

According to the contracting officer's final decision, insurance information is publicly available in the contract documents. Specifically, the contracting officer cites to the solicitation, which details the contract's insurance requirements at paragraph H–4, "Required Insurance." Paragraph H–4 requires the contractor to maintain workers' compensation, employer's liability insurance, general liability insurance, automobile liability insurance, and aircraft public and passenger liability insurance. The contracting officer also relies on clauses included in the solicitation regarding insurance, FAR 52.228–3, "Workers' Compensation Insurance (Defense Base Act) (APR 1984)," and FAR 52.228–5, "Insurance—Work on a Government Installation (JAN 1997)." Furthermore, the Wage Determination portion of the solicitation provides that employees are to receive an average of $2.56 per hour for life, accident, health insurance plans, sick leave, pension plans, civic and personal leave, severance pay, and savings and thrift plans.

Insurance for the benefit of employees is part of employee compensation, the disclosure of which in the *Synetics* case was found not to be actionable. *See Synetics, Inc. v. United States,* 45 Fed.Cl. at 14–15 (finding that the release of compensation information did not violate the Procurement Integrity Act, 41 U.S.C. § 423(b)); *see also Martin Marietta Corp. v. Dalton,* 974 F.Supp. at 41 (finding that release of the contractor's alleged proprietary information was not improper since the contractor had failed to demonstrate that such release would result in substantial competitive harm).

The plaintiff has not demonstrated that Mr. Wilbanks' information would lead King to cheaper insurance. For example, Mr. Wilbanks suggested that, to reduce personnel turnover, a contractor might provide better benefits, such as insurance coverage during deployment. Not only does this general statement not reflect any keen insights, but, by attempting to reduce turnover through

this mechanism, there is a trade-off—increased costs. How much will turnover be reduced? How much will increased insurance benefits cost? Was Mr. Wilbanks speaking of his own situation, from his own viewpoint? How much have insurance rates changed since 1999, the award date of Avtel's last Dash 7 contract? In short, the information provided by Mr. Wilbanks, beyond that contained in the solicitation, was too vague and unspecific to be of any real competitive use. There are simply too many relevant variables to conclude that King, somehow, could use Mr. Wilbanks' information and, thereby, secure a competitive advantage. The contracting officer's decision not to disqualify King based on this item, therefore, had a reasonable basis.

### 17. Turnover

■ In response to the question of whether Avtel experiences [deleted] personnel turnover, Mr. Wilbanks' answer was: "There is high turnover at least [deleted] every three months. Deployment has at least [deleted] a year that can't survive it and must come home. Bringing back an employee while on deployment is at the contractor's expense." As for what could be done to alleviate the problem, Mr. Wilbanks suggested "[deleted]." Avtel argues that this knowledge enables King to adjust its contingent pricing to account for deployed individuals who decide to come home early.

The contracting officer concluded that information on Avtel's employee turnover did not meet the definition of bid or proposal information, and did not confer a competitive advantage on King. King contends that information on Avtel's personnel turnover is in the public domain. Specifically, the Maples thesis lists a number of factors such as physical danger, rigorous working conditions, and low pay as reasons for high turnover, and notes that contractors replace personnel at no cost to the government.

The court finds that the information obtained from Mr. Wilbanks on Avtel's personnel turnover is in the public domain and, therefore, did not give King a competitive advantage. First, the Maples thesis, which is in the public domain, identified a high

turnover rate based on the conditions under which deployed individuals must operate. In addition, the Maples thesis observed that contractors must replace, at their own expense, employees who will not deploy, thus communicating to King and other offerors that they must adjust their contingent prices accordingly. Avtel, therefore, has not demonstrated that the information Mr. Wilbanks conveyed to King conferred on King a competitive advantage. The contracting officer's final decision not to disqualify King for this item had a reasonable basis.

### 18. Wages

■ According to Keith Weaver's meeting notes, Avtel employee Wilbanks thought that wage levels were below what they should be, noted the 15 percent pay differential when employees deploy, indicated that the average mechanic made between [deleted] an hour, and indicated that the Quality Assurance and Avionics managers made [deleted] a year. Avtel believes this information to be competition sensitive information.

The contracting officer's final decision concluded that information on wages is not proprietary, citing the Area Wage Determination attached to the solicitation, and its required minimum wages. The contracting officer also cited the *Synetics* case, for the proposition that the disclosure of compensation information does not rise to the level of a violation of the Procurement Integrity Act, 41 U.S.C. § 423(b). *See Synetics, Inc. v. United States*, 45 Fed.Cl. at 14–15. The defendant and King agree that the information in the solicitation established that wages are not proprietary. King also notes that wage rates are available at the Department of Labor web site, and average salaries for employees in the Republic of Korea and El Paso, Texas, also are located on the internet. King further notes that the Maples thesis informs that Avtel is required by the contract to pay its employees a 15 percent differential while in hostile areas.

The court concludes that compensation information is not proprietary under these facts and circumstances, since minimum wages are found in the public contract documents, and average salaries for many types

of positions are provided on the internet. Given the information available, King received no competitive advantage from Mr. Wilbanks' information. The court agrees with the *Synetics* analysis, that the release of salary information does not violate the Procurement Integrity Act. *See Synetics, Inc. v. United States*, 45 Fed.Cl. at 14–15. Furthermore, the solicitation at section 3.12.5 (Hostile Area Differential) states that an individual required to travel and work in a hostile area "shall be paid at the percentage authorized." Therefore, the information on wages that Mr. Wilbanks disclosed to King did not give King a competitive advantage. The contracting officer's decision not to disqualify King on this item had a reasonable basis.

### 19. Drug Testing

■ According to Keith Weaver's meeting notes, Mr. Wilbanks indicated that Avtel conducts "[deleted]" on its employees. Avtel claims that this information is proprietary.

The contracting officer's final decision concluded that drug testing is either a regulatory or contractual requirement and not contractor bid or proposal information. The defendant similarly argues that the Dash 7 Statement of Work indicates that all Army contract non-crew members must undergo flight physicals, conducted in accordance with Army Regulation 95–20, "Contractor's Flight and Ground Operations," Nov. 13, 2002, and Army Regulation 40–501, "Standards of Medical Fitness," Feb. 1, 2005, which require a determination of drug and alcohol abuse. King also argues that drug testing information is in the public domain and cites the solicitation clause at FAR 52.223–6, "Drug-Free Workplace (MAY 2001)," which provides for workplace drug program practices. King also notes that FAA regulations, found on the FAA web site, require implementation of a drug-free awareness program for this contract.

Mr. Wilbanks' mention of "[i]nitial and recurring drug testing" is too vague and unspecific to provide any competitive advantage beyond the drug program sources for information noted above, such that the contracting officer's decision not to disqualify King on this item had a reasonable basis.

### 20. Government/Army Information, Reference to Army Regulation 95–20

■ According to Keith Weaver's meeting notes, Mr. Wilbanks mentioned Army Regulation 95–20, which addressed flight and ground operations, such as towing airplanes and running engines. Avtel believes that this information from Mr. Wilbanks gave King an unfair competitive advantage.

The contracting officer's final decision concluded that the Army Regulation is publicly available on an Army publications web site, *www.usapa.army.mil*, and, therefore, is not proprietary to any contractor. The government and King similarly argue that this regulation is in the public domain, noting that Army Regulation 95–20, "Contractor's Flight Operations," Nov. 13, 2002, is referenced several times in the 2004 Dash 7 solicitation. King also notes that the 1999 Avtel contract obtained under FOIA references Army Regulation 95–20. This regulation as well as numerous other military regulations and manuals are incorporated by reference into the 1999 Dash 7 contract, as indicated by the Mapels thesis. Army Regulation 95–20 also is in the public domain because it is published and readily accessible. Therefore, Mr. Wilbanks' mention of Army Regulation 95–20 did not give King a competitive advantage, and the contracting officer's decision not to disqualify King based on this item had a reasonable basis.

### 21. How to Get Resumes

■ According to Keith Weaver's meeting notes, Mr. Wilbanks was asked for the best way to obtain resumes from employees, and responded that "[deleted]." Mr. Wilbanks also indicated that he would be forwarding the resumes of three Avtel employees interested in employment if King received the contract.

In his final decision, the contracting officer noted that King had held an "industry day" and had asked for references of qualified personnel. The contracting officer also concluded that personal resumes were not proprietary to a contractor, citing *Synetics* and FAR 3.104–1 (defining contractor bid or proposal information) for his conclusion. *See Synetics, Inc., v. United States,* 45 Fed.Cl. at 14 (finding that a list of incumbent's employees who were candidates for employment with a competitor did not meet the definition of contractor bid or proposal information). The court agrees. Plaintiff has not demonstrated that Avtel employees were forbidden to indicate their interest and availability to King, or that employees' resumes were proprietary to Avtel. For this reason, the contracting officer's final decision not to disqualify King based on this item had a reasonable basis.

### 22. Past Employees Who Can Help

■ According to Keith Weaver's meeting notes, Mr. Wilbanks was prepared to identify personnel who could be useful to King. Avtel argues that Mr. Wilbanks not only provided King with the names of Avtel employees who could help King with its Dash 7 proposal, but that those employees actually provided valuable information to King to help them with their contract proposal. The contracting officer addressed the first part of Avtel's allegation in his decision by reasoning that information about past employees is "personal information of the employees," that "does not fit the definition of contractor bid or proposal information." Before the court, the government reiterated the contracting officer's conclusions. For its part, King noted three web sites that provided information about numerous former employees who are sources of information on the Dash 7 program.

In support of Avtel's second argument, that actual competition sensitive information was provided to King by Avtel employees, Avtel notes that former Avtel employee Kent Lebo provided King with Avtel's 1999 proposal. Avtel's 1999 proposal is addressed below, with the court concluding that no competition sensitive information was revealed to King through the proposal. Avtel also argues that Mr. Wilbanks shared "inside information" with King. According to Keith Weaver's notes, Mr. Wilbanks "confirmed that there would be certain things he would not be at liberty to discuss as an employee of Avtel. He limited his answers for the questions below to topics he felt were fair to discuss." After reviewing what information

Mr. Wilbanks did share with King in this section of the opinion, the court has concluded it did not include competition sensitive information. The contracting officer, therefore, had a reasonable basis for not disqualifying King on this issue.

### 23. Name of Site Manager

██ According to Keith Weaver's meeting notes, Mr. Wilbanks identified Avtel's Korean site manager by name. Avtel argues that the name was proprietary. The contracting officer's final decision concluded that the name of the site manager was not proprietary, reasoning that names and current positions are contained on resumes. King adds that the site manager's name was in the public domain via the posting of his name on a web site. The Korean site manager was described, by name, as the person providing "direct leadership and guidance to twenty-one personnel." Defendant argues that the name of the site manager, whether or not publicized, is not proprietary to a contractor. As the contracting officer's final decision states, this is "resume information," which does not rise to the level of contractor bid or proposal information. *See Synetics, Inc. v. United States*, 45 Fed.Cl. at 14. In the court's view, the contracting officer had a reasonable basis for not disqualifying King on this basis.

### 24. Overtime Policy

██ Keith Weaver's meeting notes indicate that Mr. Wilbanks informed King: "When the plane requires heavy maintenance they go 24/7 to get the plane back up," and the contractor is not permitted to invoice the Army for overtime, but that overtime is bid into the contract. Avtel asserts that the fact "Avtel chooses to work '24/7' to get the planes back up" is proprietary.

The contracting officer's final decision cited the following language in the 2004 Dash 7 Statement of Work:

> To support mission operations tempo, and training requirements, the contractor shall perform routine maintenance functions when aircraft are not performing missions. This shall require the contractor to perform maintenance before/after nor-

mal duty hours and on weekends at no additional cost to the government.

The solicitation, and the Dash 7 mission, therefore, require work before and after normal duty hours, including weekends, and at no additional cost to the government. There is little difference between Mr. Wilbanks' statement on overtime and the solicitation language. For this reason, the contracting officer had a reasonable basis for not disqualifying King on this issue.

### 25. Duty Time

██ According to Keith Weaver's meeting notes, Mr. Wilbanks informed King, when asked about the normal duty time of Avtel's Korea site employees, that: "Their normal shift week is a reliable 40 hour week. The work is [deleted] with [deleted] days on and [deleted] days off routine." Avtel argues that this information is competition sensitive.

The contracting officer's final decision concluded that duty time was not competition sensitive information because the Statement of Work "tells the contractor that the duty time will be irregular and determined by the mission requirements," and the contracting officer "could not find evidence that this was contractor bid or proposal information." The government and King also argue that the duty time information was in the public domain because it was described in the Statement of Work. The Statement of Work section relied on was quoted immediately above in the discussion of "Overtime Policies." Duty time is driven by mission requirements, which will require maintenance services "before/after normal duty hours and on weekends ...." Given the mission-driven, overtime, nature of the Dash 7 contract, Avtel has not demonstrated how normal shift hours provided King any competitive advantage, or how King used this information in its proposal. The court concludes that the contracting officer had a reasonable basis for not disqualifying King on this item.

### 26. Special Equipment Required

██ According to Keith Weaver's meeting notes, when asked if there was special equipment required in Korea, Mr. Wilbanks

replied that, "[a]ll unique repairs that require special equipment are performed by [deleted] especially when there is damage or the plane requires painting." Avtel argues that King gained a competitive advantage from this information.

The contracting officer's final decision noted that Appendix F of the 2004 solicitation listed the equipment furnished by the government. Appendix F consists of a forty-four page inventory of government furnished property. The contracting officer explained in his final decision that, "[a]s with all government furnished property, if it is not listed on Appendix F, then the contractor should plan on providing the special equipment themselves."

As for Avtel's use of [deleted] as a subcontractor for work in Korea, the contracting officer concluded that Avtel has not demonstrated that such generalized information, without more, rises to the level of protected contractor bid or proposal information, or how this information gave King a competitive advantage. Avtel speculates that King can "try to forge a relationship with [deleted]." However, King's 2004 proposal provides that King [deleted]. King's proposal also states that King will then choose the "[deleted]." This selection process, as outlined in King's proposal, indicates that mere awareness of specific vendors provides no competitive advantage. Nor has Avtel demonstrated that King took advantage of the information in preparation for its 2004 Dash 7 proposal. The court concludes that the contracting officer had a reasonable basis for not disqualifying King on this item.

### 27. A Contact at [deleted] for Parts

■ According to Keith Weaver's meeting notes, Mr. Wilbanks provided King with contact information at [deleted] by instructing King "to talk to [deleted] about [deleted] parts." Avtel believes that King derived a competitive advantage by knowing that Avtel used [deleted] as a supplier on its Dash-7 contract and had an employee contact at [deleted]. The contracting officer, however, found that contact information for personnel in [deleted] service and parts department was publicly available through [deleted] internet site.

The government and King echo the contracting officer's findings that [deleted] contact information is in the public domain because it is on [deleted] website, which contains the names and numbers of several contacts for parts and services and describes the various aspects of [deleted] aircraft specialties, including products, services, engineering services, and inventory. As discussed previously, King's proposal stated that it would acquire [deleted]. Avtel has not demonstrated that King obtained a competitive advantage from general knowledge of the existence of any particular parts vendor, or how such general knowledge rises to the level of contractor bid or proposal information. The record does not reflect that Mr. Wilbanks provided detailed information, such as Avtel's specific pricing arrangements with [deleted] or other subcontracting details. This court, therefore, finds that the contracting officer had a reasonable basis for declining to disqualify King based on this item.

### 28. Maintenance of Propellers

■ An e-mail from Avtel employee Mike Barber to King Aerospace employee Larry Breau states in part: "The Props are [deleted] and we [Avtel] send them to several subcontracts but, one for sure is [deleted]." Avtel argues that this vendor information is proprietary. The contracting officer's final decision stated that the requirements regarding maintenance of propellers were publicly available in the Statement of Work at paragraphs 3.19, "Propeller Assembly Maintenance," and paragraph 3.50.5, "Propellers." The contracting officer found that the propeller information was in the public domain because the Statement of Work "tells the contractor what is required and what is the standard for maintenance of propellers." King and the government further point out, by citing to a list of propeller contractors, including [deleted], that there are several contractors available to perform the type of work that is required by the government. The record reflects that King's practice is to

[deleted]. The record does not reflect that Avtel's specific pricing arrangements or other details of any Avtel service contract were disclosed. Avtel has not demonstrated that the general information disclosed to King rises to the level of contractor bid or proposal information, or that King was given a competitive advantage. The court finds that the contracting officer's final decision had a reasonable basis for declining to disqualify King on this basis.

### 29. Identity of Potential Employees

■ Identifying potential Avtel employees is similar to obtaining resumes from Avtel employees, which was addressed earlier. The contracting officer's final decision found that the identity of potential employees is not proprietary information, but information that would be "personal information known to an employee of friends and relatives that might have the skills required for this type of work." This reasoning is supported by the decision in *Synetics,* which found that a list of the incumbent's employees who were candidates for employment with a competitor was not contractor bid or proposal information. *See Synetics, Inc. v. United States,* 45 Fed.Cl. at 14; *see also Textron Marine Sys.,* 1994 WL 424686, at *4, 6, 8.

King also argued that the identity of Avtel employees who could be contacted by King as potential employees was posted on Avtel's web site. Avtel did not dispute that the names of its employees were posted on the internet. Instead, Avtel contends that King was not merely seeking the identities of Avtel employees as potential employees, but that King sought contact information in order to collect proprietary information from Avtel employees. However, as the discussion of each of the categories of information in this section of the opinion reflects, Avtel has failed to demonstrate that the information was contractor bid or proposal information and/or that its disclosure gave King a competitive advantage. The contracting officer's final decision, therefore, not to disqualify King on this item from plaintiff's list of complaints, had a reasonable basis.

### 30. Deployment Site Setup

■ Avtel argues that King received information regarding deployment site set-up from Avtel employee Isaiah House, who sent an e-mail to King employee Larry Breau, which stated that: [deleted].

In his final decision, the contracting officer concluded that the material concerning deployment site set-up is not proprietary to the contractor, but falls within the public domain. The contracting officer cited Statement of Work paragraph 3.35.5, "Deployment to Support Scheduled Operations at a Forward Operational Area," which states: "Contractor personnel shall assist in the preparations and load-out for each deployment to forward operations areas prior to commencing operations, and shall assist with the loading and unloading of Government property as necessary during deployment and recovery to the permanent BB [Bed–Down Base] or other area as determined by the Government." King notes that detailed deployment site set-up information is available on the internet. The Apiay, Colombia Briefing for the U.S. Army SOUTHCOM contains detailed deployment site set-up information with pictures and maps of the site highlighting building interiors, recreational, and communication information. Furthermore, the briefing discloses information on work space and vehicles provided for contractor use.

Avtel has not demonstrated that the summary information at issue on deployment site setup gave King a competitive advantage. The Statement of Work, at paragraph 3.35.5, also indicates that the government will provide the contractor with all necessary and required information associated with equipment, support, and facilities that will be available at deployment sites. Avtel has not shown any impact from the deployment information at issue on King's bid. The court finds that the contracting officer's final decision to not disqualify King based on this item had a reasonable basis.

### 31. Qualified Person for Quality Assurance

■ This item involves a King search for a recommendation on a quality assurance candidate, and is similar to earlier sections

on obtaining resumes and identifying potential employees. Avtel's complaint here is that King employee Breau sent an e-mail to Avtel employee Barber, asking who could fill a senior quality assurance position in the upcoming Dash 7 contract. Plaintiff believes King's request for a candidate was inappropriate because any answer to the question would be proprietary.

In his final decision, the contracting officer concluded that information on a qualified person for quality assurance "would be personal knowledge of the person working in the field," such as Mr. Barber, and was "not proprietary information." The court agrees. Under these facts, asking one employee's opinion of another does not rise to the level of contractor bid or proposal information. *See Synetics, Inc. v. United States*, 45 Fed. Cl. at 14; *Textron Marine Sys.*, 1994 WL 424686, at *6, 8. In his final decision, the contracting officer had a reasonable basis not to disqualify King based on this item.

### 32. Whether the Army Likes [deleted]

Plaintiff complains that King employee Breau, in an e-mail to Avtel employee Barber, asked whether the Army "liked what [deleted] has done for them?" The record does not reflect the answer to that question, but plaintiff believes that an answer would be proprietary.

The contracting officer's final decision appropriately notes that, "[t]he only way to really know if the Army likes [deleted] would be to ask the Army." The contracting officer reasoned that the question in the e-mail merely seeks the opinion of individual employees and would not provide a competitive advantage. The record indicates that: "[deleted]."

Avtel's argument as to the [deleted] connection is unconvincing. First, the record does not reflect that King's [deleted] stemmed from the question asked in the e-mail, nor does the record even reflect that the e-mail question was answered. Secondly, [deleted] only expressed a desire to submit a proposal for consideration to King for subcontractor work, a proposal which might or might not be submitted and might or might not be accepted by King. Finally, had Mr.

Barber responded to the e-mail, which the record does not reflect, it would have been his personal opinion, not the opinion of the Army, and something less than contractor bid or proposal information. *See Textron Marine Sys.*, 1994 WL 424686 at *10–11 (statement of opinion based on observations of one contractor did not confer a competitive advantage on another contractor). The contracting officer's final decision, declining to disqualify King based on this item, had a reasonable basis.

### 33. Is There a Parts Depot

■ Plaintiff complains that King employee Breau, in an e-mail to Avtel employee Barber, asked: "Does the company [Avtel] have a parts depot, separate from the hangar ...." The record does not reflect the answer to the e-mail question, or even if there was a response. Avtel contends that King sought competition sensitive information as to whether Avtel maintains a parts depot in addition to the space provided by the government.

The contracting officer's final decision cited to the 2004 Dash 7 Statement of Work at paragraph 3.38, titled "Facilities," which indicates that: "The Government will provide reasonable office and storeroom space and furnishings IAW [in accordance with] Army Space Utilization Guidelines and best commercial practices. When government facilities are not available, the contractor may use leased or rented facilities to accomplish specific maintenance requirements when authorized by the PCO [Procuring Contracting Officer] on a reimbursable basis." In addition, the Statement of Work, at paragraph 3.4.9, Storage and Use of Government Property, charges the contractor with implementing and providing an adequate storage system for all government property.

The record does not reflect a response on the parts depot question. Even if the e-mail question had been answered, Avtel has not demonstrated that such information rises to the level of a competitive advantage. Avtel did not show and the record does not reflect that Avtel's specific, detailed parts depot information was given to King. Moreover, as

the contracting officer noted, when government facilities are unavailable, the agency may authorize a contractor's use of leased facilities on a reimbursable basis to compensate the contractor for funds expended. Even if the existence of a parts depot had been disclosed, under these circumstances, it would not rise to the level of a competitive advantage. The contracting officer's decision not to disqualify King on this item, therefore, had a reasonable basis.

### 34. 1999 Avtel Proposal

[deleted]

The thirty-four items analyzed above are either in the public domain, or it has not been demonstrated that they provided King a competitive advantage. For this reason, the contracting officer's December 8, 2004 decision not to disqualify King from the Dash 7 solicitation is upheld by this court.

*Competitive Advantage during the "Capture Phase"*

Plaintiff also contends that the information about Avtel obtained by King not only assisted King in preparing its proposal (with which the court disagrees), but also assisted King during the earlier "capture phase," which plaintiff describes as a "period whereby a contractor makes the crucial determination whether or not to pursue a contract, and expend valuable time and resources." The plaintiff contends that the information provided to King by Avtel employee Donald Wilbanks and others assisted King to make the determination to pursue the Dash 7 procurement.

In support of its theory on the capture phase, plaintiff cites to *Compliance Corporation v. United States* for the proposition that when one competitor obtains, or attempts to obtain, another competitor's bid proposal, the integrity of the procurement is at risk, and a contracting officer's disqualification of the first competitor will be sustained. *Compliance Corp. v. United States*, 22 Cl.Ct. at 203, 206. The court finds this proposition to be unremarkable. The *Compliance* case, nevertheless, is distinguishable from the present case on several grounds. First, although the plaintiff is discussing the capture phase and citing the *Compliance* case, a capture phase

was not at issue, and was not even mentioned in *Compliance*. Second, employees of Compliance Corporation had either obtained, or attempted to obtain, the actual proposal another offeror had submitted to the Navy pursuant to a solicitation. *Id.* at 194–96, 202. In the present case, plaintiff has not argued, and there is no indication in the record, that King obtained the actual 2004 proposal Avtel submitted in response to the 2004 Dash 7 solicitation. Finally, in *Compliance,* the Navy contracting officer disqualified Compliance Corporation, which the court found to be reasonable. *Id.* at 202, 206. In the present case, the Army contracting officer declined to disqualify King, which, after review, this court has found to be reasonable, not arbitrary or capricious, and in accordance with the law. In this regard, the *Compliance* opinion reminds us that a court should not substitute its judgment for that of the agency, unless the agency's determinations were unreasonable, arbitrary or capricious or not in accordance with the law. *Id.* at 198, 204. This rule controls not only when the contracting officer disqualifies an offeror, but also when the contracting officer declines to disqualify an offeror.

The plaintiff has provided no case or other authority addressing the capture phase. However, even if the capture phase were a legitimate area of inquiry, the court's earlier finding that the information obtained by King was not competition sensitive controls. The information at issue was found to be in the public domain, stale and too removed from the current procurement and/or innocuous with respect to the solicitation at issue. Plaintiff, therefore, has not demonstrated, and cannot demonstrate that information which the court has found to be of no assistance to a competitor in the bidding process is, nevertheless, actionable at an earlier "capture" phase.

*Bias*

In general, the plaintiff further contends that bias on the part of government officials involved in the 2004 Dash 7 contract procurement process against Avtel prevented Avtel's bid proposal from being fairly and objectively evaluated. The first issue concerns alleged

bias on the part of the Source Selection Evaluation Board (SSEB). Plaintiff refers specifically to an e-mail drafted by government official Michael Botkin, which allegedly contained derogatory comments about Avtel; also allegations of bias involving government officials Michael Botkin, Henrietta Maples, and Michael Courtemanche, who were removed from the SSEB in January, 2005; and allegations that SSEB evaluators were exposed to evaluations completed by Ms. Maples and Mr. Courtemanche during their tenure on the SSEB. Plaintiff's second issue alleges bias in the technical evaluation process, specifically comparing Avtel's "[deleted]" technical rating with King's "[deleted]" rating in the evaluation of proposals and how King, like Avtel, was designated a [deleted] in the category of past performance. Finally, the third issue involves the allegation that the government contracting officer asked former Avtel owner Kent Lebo to compete against Avtel and to bid on the Dash 7 contract.

*Presumption of Good Faith*

In 2002, the Federal Circuit stated that "for almost 50 years this court and its predecessor have repeated that we are 'loath to find to the contrary [of good faith], and it takes, and should take, well-nigh irrefragable proof to induce us to do so.'" *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239 (Fed.Cir.2002) (quoting *Schaefer v. United States,* 224 Ct.Cl. 541, 633 F.2d 945, 948–49 (1980)) (alteration in original); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1330 ("[W]hen a bidder alleges bad faith, 'in order to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable.'") (quoting *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1323 n. 2) (alteration in original); *CACI, Inc.–Federal v. United States,* 719 F.2d 1567, 1582 (Fed.Cir.1983) (determining that suspicion and innuendo, and the possibility and appearance of impropriety, without "hard facts" inferring actual misconduct, provide an inadequate basis for withholding award of the contract); *Torncello v. United States,* 231 Ct.Cl. 20, 45, 681 F.2d 756, 770 (1982) (stating "the government ... is assumed always to act in good faith, subject only to an ex-

tremely difficult showing by the plaintiff to the contrary.") (citation omitted); *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 193–94, 543 F.2d at 1298 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *Librach v. United States,* 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959) (stating that "clear evidence to the contrary" is necessary to overcome the presumption in favor of the government); *Four Points by Sheraton v. United States,* 63 Fed.Cl. 341, 344 (2005) (finding that in order for the protestor to prevail on an allegation of bias and bad faith, it must overcome the presumption of regularity and good faith); *Orion Int'l Tech. v. United States,* 60 Fed.Cl. 338, 344 (2004) (finding that a court must not inquire into the mental processes of an administrative decisionmaker without a "strong showing of bad faith") (quoting *Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); *Caldwell & Santmyer, Inc. v. Glickman,* 55 F.3d 1578, 1581 (1995) (reiterating the principle that "[a] contractor can overcome [the presumption that the government acts in good faith] only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it" (quoting *Torncello v. United States,* 231 Ct.Cl. at 45, 681 F.2d at 770)); *Libertatia Assocs. Inc. v. United States,* 46 Fed.Cl. 702, 706 (2000) (finding agency official acted with ill will toward plaintiff and manifested specific intent to injure); *Hoffman v. United States,* 16 Cl.Ct. 406, 410 (1989) (finding that mere contentions of bias do not constitute proof), *aff'd,* 894 F.2d 380 (Fed.Cir.1990); *Space Age Eng'g, Inc. v. United States,* 4 Cl.Ct. 739, 744 (1984) (finding that inferences, suspicion and innuendo are insufficient to fulfill the clear and convincing proof required to show bias on the part of the government) (citing *Heyer Prods. Co. v. United States,* 135 Ct.Cl. 63, 140 F.Supp. 409, 414 (1956)); *China Trade Ctr. v. Washington Metro. Area Transit Auth.,* 34 F.Supp.2d 67, 70–71 (D.D.C.1999), *aff'd,* 1999 WL 615078 (D.C.Cir.1999).

In *Am–Pro Protective Agency, Inc. v. United States,* the Federal Circuit considered the extent of proof required to demonstrate that the government acted in bad faith

and modernized the language of the "well-nigh irrefragable proof" standard, consistent with its "well-established precedent that a high burden must be carried to overcome" the presumption of good faith. *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1239. The court determined that the "clear and convincing" standard of proof "most appropriately describes the burden of proof applicable to the presumption of the government's good faith." *Id.* "Based on this well-established precedent, it logically follows that showing a government official acted in bad faith is intended to be very difficult, and that something stronger than a 'preponderance of evidence' is necessary to overcome the presumption that he acted in good faith, i.e., properly." *Id.* at 1240; *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d at 1330 (" 'Almost irrefragable proof' amounts to 'clear and convincing evidence.' " (quoting *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1239–40)).

The Federal Circuit in *Am–Pro Protective Agency* described the "clear and convincing" standard of proof, as follows:

> A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. "Clear and convincing" evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is "highly probable."

*Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1240 (quoting *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed.Cir.1993)). The Federal Circuit also described the type of proof necessary to establish that a government official acted in bad faith by "clear and convincing" evidence, or "well-nigh irrefragable proof," as it was previously termed:

> In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some specific intent to injure

the plaintiff. Thus, in *Gadsden v. United States*, [111 Ct.Cl. 487, 489–90, 78 F.Supp. 126 (1948)] the court compared bad faith to actions which are "motivated alone by malice." In *Knotts*, [*v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954)], the court found bad faith in a civilian pay suit only in view of a proven "conspiracy ... to get rid of plaintiff." Similarly, the court in *Struck Constr. Co. v. United States*, [96 Ct.Cl. 186, 222, 1942 WL 4411 (1942)] found bad faith when confronted by a course of Governmental conduct which was "designedly oppressive." But in *Librach*, [*v. United States*, 147 Ct.Cl. 605, 1959 WL 7633 (1959)], the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

*Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1240 (quoting *Kalvar Corp. v. United States*, 211 Ct.Cl. at 192, 543 F.2d at 1302) (citations omitted); *see also Galen Medical Assocs., Inc. v. United States*, 369 F.3d at 1330 (" 'In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some specific intent to injure the plaintiff.' " (quoting *Torncello v. United States*, 231 Ct.Cl. at 45, 681 F.2d at 770)). This background informs the analysis below.

1. *Personnel on the Source Selection Evaluation Board*

 Plaintiff complains of bias on the part of Army personnel, and alleges that bias may have found its way into the Source Selection Evaluation Board (SSEB) for the 2004 Dash 7 procurement. According to the plaintiff, Army officials Henrietta Maples[4] and Michael Botkin harbored bias against Avtel. First, the plaintiff claims that a January 25, 2005 e-mail sent by Mr. Botkin, a subordinate of Ms. Maples, to Ms. Maples and others, reflects Mr. Botkin's bias against Avtel. The subject of the e-mail was "Request for milling machine components." The text of the e-mail stated:

---

4. As noted earlier, plaintiff argues that Henrietta Maples wrote a thesis published by the Naval Post–Graduate School, which contained com-

mercially sensitive Avtel information. This issue is discussed in a separate section below.

Unless AVTEL and the ARMY have Parts Manufacturer Approval (PMA) or Technical Standard Order (TSO) which requires a PILE of litigation fees, certifications and licensing (AVTEL, after a month of [an Avtel employee] being fired had yet to meet the required list of changes under FAA FAR 145.161 of revising the key personnel roster of the repair station within five business days), I seriously doubt that they have done ANY of the "harder" things required to manufacture parts. Furthermore, AVTEL consistently brokers out simple sheet-metal repair work and fuel leak repair work ala the High–Lock incident. So giving AVTEL a milling machine is paramount to getting a 2–year–old child a loaded .44 Magnum to play with instead [of a] cardboard box! My suggestion is to ask to see AVTEL's PMA or TSO certification and then sell the machine at a DRMO sale before we find out AVTEL tried their hand at manufacturing wing bolts out of some low-grade stock they got from [an Avtel executive] rusting out in a pile of dirt held back of his hanger!!!! Nuff said!!!

From the somewhat colorful language of the e-mail quoted verbatim above, Mr. Botkin appears to hold views critical of Dash 7 incumbent Avtel's policy on farming out certain work to subcontractors, and of Avtel's capability to perform certain other work in-house. The record does not indicate whether or not the statements in the e-mail have a reasonable basis. Instead, the issue raised by Avtel is whether the e-mail reflects preconceived, adverse notions about Avtel on the part of Mr. Botkins, such that Mr. Botkin should not be part of a neutral evaluation team for the Dash 7 procurement. The e-mail was sent to Henrietta Maples and Michael Courtemanche, who, along with Mr. Botkin, were to perform an evaluation of the Logistics Concept Element on the Dash 7 Source Selection Evaluation Board. The Army's challenge was to find personnel for the SSEB who were capable of performing a competent evaluation of the offerors' Dash 7 proposals, but who also were neutral. In a declaration contained in the record, contracting officer Hubbard stated that the Army was sensitive to the fact that Avtel's counsel previously had raised allegations of bias against Avtel,[5] and the Army wanted to ensure a fair and unbiased Dash 7 evaluation. Thus, SSEB member Botkin, and the two SSEB members who had received his Avtel e-mail, Ms. Maples and Mr. Courtemanche, all of whom were scheduled to evaluate the Logistics Concept Element on the SSEB, were replaced, and "their written files, electronic files and office keys were delivered directly to me [contracting officer Hubbard]." The new Logistics Concept Element evaluation team was comprised of support contractor personnel, Monika Diaz and Michael Fitzpatrick. Both Ms. Diaz and Mr. Fitzpatrick indicated in declarations that they completed their evaluations of the Dash 7 proposals without input from Ms. Maples, Mr. Botkins or Mr. Courtemanche, their SSEB Logistics Concept Element predecessors.

There is no evidence in the record that Ms. Diaz or Mr. Fitzpatrick were influenced by the SSEB members they replaced. Another issue, however, is whether any other members of the SSEB were influenced by Mr. Botkins, Ms. Maples or Mr. Courtemanche. Notes and evaluations of Dash 7 proposals for the Logistics Concept Element prepared by Ms. Maples and Mr. Courtemanche were seen by SSEB members Charles Garrison and John Perkinson, who were evaluating the Engineering Element, and SSEB member Master Sergeant Tanya Whitney, who was evaluating the Operations Support Element. In declarations submitted to the court, all three denied being influenced by the materials on the Logistics Concept Element from the replaced SSEB members, which is understandable, since Mr. Garrison, Mr. Perkinson and Master Sergeant Whitney were assigned to evaluate Dash 7 proposals in areas other

---

**5.** According to a declaration by Dash 7 contracting officer Carole Hubbard:

On or about 15 Oct 04, AVTEL sent an email requesting that Ms. Maples and her staff be disqualified from serving on the Source Selection Evaluation Board due to potential bias evidenced by the publication of Ms. Maples' thesis. At that time, a review of the thesis was conducted and the finding revealed that the information presented in Ms. Maples' thesis did not warrant her removal from the SSEB.

than the Logistics Concept Element, as noted above. Therefore, there is no indication that the replaced SSEB members had any influence on the evaluation process, either through their successors, or through other SSEB personnel evaluating other areas, all of whom are presumed to have acted independently. The court finds that, in replacing the three SSEB members, the Army acted responsibly further to ensure the integrity of the procurement process, and there is no indication in the record of undue influence on any SSEB members.

The plaintiff, however, assumes bias and states, "[g]iven the existence of bias, the burden of proof shifts to the Government to show that the protester was not prejudiced by the Government's actions," citing *In re Lockheed Martin Corp.,* B–295402, 2005 CPD ¶ 24, 2005 WL 433641 (Comp.Gen. Feb. 18, 2005). In this *Lockheed Martin* bid protest, the Government Accountability Office stated that:

> where, as here, the record establishes that a procurement official was biased in favor of one offeror, and was a significant participant in agency activities that culminated in the decisions forming the basis for protest, we believe that the need to maintain the integrity of the procurement process requires that we sustain the protest unless there is compelling evidence that the protester was not prejudiced.

*In re Lockheed Martin Corp.,* 2005 WL 433641, at *4. In *Lockheed Martin,* a government official had admitted bias in favor of a government contractor in exchange for various employment benefits provided to the government official's family and based on the government official's own desire to be employed by the contractor upon retiring from government service. *Id.* at *2–3. In the present case, the record reflects that the Army removed Mr. Botkins in an abundance of caution, to ensure fairness, as well as the appearance of fairness, in the Dash 7 procurement. In *Lockheed Martin,* the government official was the source selection authority and was, therefore, in a position to, and did, make significant procurement decisions in favor of a contractor. *Id.* at *5–6. In the

present case, the Army took action to remove the entire Logistics Concept Element team of the SSEB in order to ensure that the officials removed were unable to have any impact on the Dash 7 procurement process. The Government Accountability Office's *Lockheed Martin* case, therefore, is distinguishable from the present case. Plaintiff's allegation of bias, or bad faith, remains governed by precedent from the United States Court of Appeals for the Federal Circuit. *See Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1330 (to overcome the presumption that government officials acted in good faith, and show, instead, bad faith, requires a plaintiff to show clear and convincing evidence of some specific intent on the part of government officials to injure the plaintiff).

Plaintiff also argues bad faith in the actions of the Army to destroy the evaluations of Ms. Maples and Mr. Courtemanche once they were removed from the SSEB.[6] In this regard, in a declaration, contracting officer Hubbard stated that:

> Prior to the arrival of the new evaluation team [of Ms. Diaz and Mr. Fitzpatrick], I personally shredded the individual and consensus evaluations prepared by Ms. Maples and Mr. Courtemanche that they handed over to me. I do not know the specific date that I shredded the documents but it was between 6—14 January 2005. I shredded the documents because I did not want the new evaluation team to possibly be influenced by the previous evaluations. I also did not want these evaluations to be inadvertently included with the evaluations that were going to be the basis of the source selection decision.

The record reflects that, in an abundance of caution, the Army removed the original members of the SSEB assembled to evaluate the Logistics Concept Element of the Dash 7 proposals and, further, destroyed hard copy evaluations from the removed members, to try to ensure that the opinions of former logistics team members and their work product did not find their way to the reconstructed SSEB. Far from reflecting bad faith on

---

6. No evaluations were received from Mr. Botkin.

the part of Army officials, these actions reflect good faith and proactive government actions. In the court's view, the steps taken by the Army officials were undertaken to ensure a procurement with integrity and promote a fair and impartial procurement process.

### 2. *Evaluation Ratings*

■ Plaintiff further contends that the Dash 7 proposal evaluation by the Army demonstrated bias against Avtel. This issue is comprised of two elements: (1) that King's "[deleted]" technical rating and Avtel's "[deleted]" technical rating, in spite of the advantages of Avtel's proposal, illustrated bias on the part of the SSEB's technical team members; and (2) that Avtel and King were both designated "[deleted]" in the area of past performance, even though King had little or no experience on the type of aircraft maintenance to be procured.

First, the plaintiff contends that it received [deleted] advantages and only [deleted] disadvantages in the technical evaluation. Yet King received a higher technical rating ("[deleted]") than Avtel received ("[deleted]"). Avtel argues that, by virtue of the number of technical advantages weighed against the number of disadvantages it received, there are no reasonable grounds to support Avtel's lower rating for technical merit. The plaintiff contends that, while contracting officer Hubbard stated in a declaration that the reconstitution of the Source Selection Evaluation Board eliminated bias, such reconstitution may have only "masked" such bias, given Avtel's low technical rating.

The Source Selection Decision, issued on April 22, 2005, stated that, "[i]n accordance with the Source Selection Plan (SSP), the selection of an offeror for award is based on a best value evaluation," and that, "[t]he Technical Area is more important than the Past Performance Area," in terms of evaluation criteria for the procurement. Within the technical evaluation area, the elements assessed were Operations Support, Logistics Concept and Engineering. The Source Selection Decision is a well reasoned, detailed document describing and comparing the overall technical and price comparisons of the offerors. The Source Selection Decision provides the following data regarding the offerors' technical area evaluations, summarized below:

**RESULTS OF THE FINAL REVISED PROPOSAL EVALUATIONS**
**SOURCE SELECTION DECISION, April 22, 2005**

| Technical Evaluation Category | Technical Evaluation Sub–Category | Offeror | Advantages | Disadvantages | Deficiencies |
|---|---|---|---|---|---|
| (1) Operations Support | Beddown Base Support factor | King | [deleted] | [deleted] | [deleted] |
| | | Avtel | [deleted] | [deleted] | [deleted] |
| | | | [deleted] | [deleted] | [deleted] |
| | Deployment factor | King | [deleted] | [deleted] | [deleted] |
| | | Avtel | [deleted] | [deleted] | [deleted] |
| | | | [deleted] | [deleted] | [deleted] |
| | Phase In/Phase Out factor | King | [deleted] | [deleted] | [deleted] |
| | | Avtel | [deleted] | [deleted] | [deleted] |
| | | | [deleted] | [deleted] | [deleted] |
| (2) Logistics Concept | Maintenance Concept and Procedures factor | King | [deleted] | [deleted] | [deleted] |
| | | Avtel | [deleted] | [deleted] | [deleted] |

| | | [deleted] | [deleted] | [deleted] |
|---|---|---|---|---|
| Material Management factor | King | [deleted] | [deleted] | [deleted] |
| | Avtel | [deleted] | [deleted] | [deleted] |
| | | [deleted] | [deleted] | [deleted] |
| Base Supply factor | King | [deleted] | [deleted] | [deleted] |
| | Avtel | [deleted] | [deleted] | [deleted] |
| | | [deleted] | [deleted] | [deleted] |
| (3) Engineering — Airworthiness factor | King | [deleted] | [deleted] | [deleted] |
| | Avtel | [deleted] | [deleted] | [deleted] |
| | | [deleted] | [deleted] | [deleted] |
| Configuration Management factor | King | [deleted] | [deleted] | [deleted] |
| | Avtel | [deleted] | [deleted] | [deleted] |
| | | [deleted] | [deleted] | [deleted] |
| Systems Engineering factor | King | [deleted] | [deleted] | [deleted] |
| | Avtel | [deleted] | [deleted] | [deleted] |
| | | *Advantages* | *Disadvantages* | *Deficiencies* |
| **Total:** | **King** | [deleted] | [deleted] | [deleted] |
| | **Avtel** | [deleted] | [deleted] | [deleted] |

The above chart shows that while Avtel received [deleted] advantages and [deleted] disadvantages, King received a total of [deleted] advantages, [deleted] disadvantage, and [deleted] deficiencies, a far greater number of advantages and even fewer disadvantages. Thus, King's score warranted a higher rating of "[deleted]" to Avtel's "[deleted]." After considering the substantial difference in technical evaluation scores between King and Avtel, which were justified in detail in the Source Selection Decision, the court concludes that the government had reasonable grounds for awarding Avtel a "[deleted]" rating and King a "[deleted]" rating on technical merits. Even if the technical evaluation scores of King, the winning bidder, and Avtel, the unsuccessful bidder, were adjusted to provide the unsuccessful bidder with the benefit of every inference and potential factual dispute, Avtel's technical evaluation scores are not close enough to King's to warrant overturning the agency's evaluation. *See* 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d at 1058 (finding no basis to overturn the agency's decision in light of the substantial differences in technical evaluation scores between the successful and unsuccessful bidders and the solicitation's emphasis on the merits of technical proposals). The Army's analysis supports the conclusion that the additional cost of Avtel's proposal was not offset by its capacity and capability. *See Banknote Corp. of America, Inc. v. United States*, 365 F.3d at 1357. Based on the information available in the record, the court cannot conclude that there was technical bias [7] in the evaluation of technical elements for the Dash 7 procurement. Instead, there was a reasonable, technical basis for the distinction between the proposals of King and Avtel.

The record establishes, as in *ITT Federal Services Corporation v. United States*, that

---

7. The Source Selection Decision did not ignore, but made reference to the strengths of Avtel's final proposal, including, for example, praise for Avtel's strong ranking in the engineering portion of its technical evaluation: "Avtel's proposal demonstrated a very detailed and thorough approach to the performance of aircraft recovery which exceeds the government's requirements."

the Source Selection Authority did not discount Avtel's aptitude in the technical evaluation area, but recognized, was aware of, and considered its capability. *See ITT Fed. Servs. Corp. v. United States,* 45 Fed.Cl. 174, 188 (1999). Furthermore, the court agrees with the proposition that "[t]echnical ratings are aspects of the procurement process involving discretionary determinations of procurement officials which a court should not second guess." *Id.* (quoting *Hydro Eng'g, Inc. v. United States,* 37 Fed.Cl. 448, 467 (1997) (citing *E.W. Bliss Co. v. United States,* 77 F.3d at 449). In reviewing a government procurement award, the court, even if it might have selected a different offeror, should defer to an agency decision that is "grounded in reason," since "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *ITT Federal Servs. Corp. v. United States,* 45 Fed.Cl. at 192–93 (quoting *E.W. Bliss Co. v. United States,* 77 F.3d at 449) (citing *Widnall v. B3H,* 75 F.3d 1577, 1580 (Fed.Cir.1996))). King's lower-priced proposal provided another reasonable basis for the award of the contract to King, as opposed to the plaintiff's attempt to characterize the award as one based on bias. In this regard, the Source Selection Decision noted that Avtel's proposal was [deleted] higher than King's. With King's higher technical ratings and lower-priced proposal, the court concludes that an award to King was not arbitrary or capricious.

Plaintiff nevertheless complains that:

The solicitation at Section M did not provide, as stated by the evaluators, that a proposal could only receive a high rating if it "exceeded" the Government's stated requirements, and the term "exceeded" was never explained or quantified, such as meaning that the Government would enjoy a real benefit from the offeror's unique or improved approach to the requirements.... [T]he solicitation said nothing about any qualitative or quantitative evaluation of "advantages," and did not say that an offeror could only receive a rating

above "Satisfactory" by exceeding requirements.

In this regard, the FAR provides that all significant factors and significant subfactors to be used in evaluating proposals will be identified in Section M of the solicitation, titled "Evaluation Factors for Award" in the Dash 7 solicitation. *See* 48 C.F.R. § 15.205–5(c) (2004). FAR 15.304(d) reiterates that all evaluation factors and significant subfactors are to be included in the solicitation, but adds that: "The rating method need not be disclosed in the solicitation." 48 C.F.R. § 15.304(d) (2004). Section M of the solicitation at issue does contain the required factors and subfactors which were used to evaluate the Dash 7 proposals. The Dash 7 Source Selection Plan provides a rating method involving advantages and disadvantages, stating that: "These ratings will be supported by the proposal's advantages, disadvantages, and deficiencies." For example, the rating "Good," is described in the Source Selection Plan as "High quality in most respects; offers one or more advantages not offset by disadvantages; good probability of success with overall low to moderate degree of risk in meeting the Government's requirements." The "Satisfactory" rating is described in the Source Selection Plan as "Adequate quality; any advantages are offset by disadvantages; fair probability of success with overall moderate to high degree of risk in meeting the Government's requirements." King points out that this rating method and definitions are found in the Army Source Selection Guide, Fig. 5–4 at 16, dated June, 2001, which contains sample proposal merit rating methods. Plaintiff does not provide further support for its Section M evaluation criteria argument in its reply brief. The court finds that the Army was in compliance with the FAR in identifying evaluation factors and in using a rating method which included advantages and disadvantages to distinguish the Dash 7 proposals.

Plaintiff further complains that it received [deleted] advantages,[8] [deleted] disadvantage and [deleted] deficiencies for the Logistics

---

**8.** The earlier chart reflecting evaluations of the final revised proposal correctly listed [deleted] advantages for Avtel, rather than the [deleted] plaintiff cites, because the Source Selection Decision split one advantage (Item 20) in the Logistics Concept Element into two advantages.

Concept Element, yet only received a rating of "[deleted]" for this factor. By way of comparison, King received an "[deleted]" rating for the Logistics Concept Element, based on [deleted] advantages, [deleted] disadvantages and [deleted] deficiencies. Avtel might have an argument if it had achieved more advantages, but the difference in the basis for the ratings ([deleted] advantages to [deleted]) justifies the difference in the ratings ("[deleted]" versus "[deleted]").

Furthermore, Avtel must demonstrate prejudice. "'[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'" *Galen Medical Assocs., Inc. v. United States,* 369 F.3d at 1330 (quoting *Data Gen. Corp. v. Johnson,* 78 F.3d at 1562). "To establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.'" *Galen Medical Assocs., Inc. v. United States,* 369 F.3d at 1331 (quoting *Statistica, Inc. v. Christopher,* 102 F.3d at 1582). Even if Avtel had received an "[deleted]" based on its [deleted] advantages, it was faced with a competitor (King) with [deleted] advantages and, therefore, a more compelling "[deleted]" when it comes to choosing an awardee. In other words, plaintiff has not demonstrated prejudice through the Army's award of a "[deleted]" rating rather than an "[deleted]" rating.

Plaintiff also complains that it received [deleted] advantages for Material Management, [deleted] disadvantage and [deleted] deficiencies, yet only received a rating of "[deleted]" for this factor. By way of comparison, King received an "[deleted]" rating for the Material Management factor, based on [deleted] advantages, [deleted] disadvantages and [deleted] deficiencies. The advantages and disadvantages provide a reasonable basis for the different adjectival ratings.

Finally, plaintiff notes that the narrative for the Base Supply factor stated that "the Offeror [Avtel] has done an excellent job of describing their approach to warranties, packaging and shipping, world wide transportation system, and flyaway kits," yet received a "[deleted]" rating. By way of comparison, King received an "[deleted]" rating for the Base Supply factor, based on [deleted] advantages, including [deleted] significant advantages, [deleted] disadvantages, [deleted] deficiencies, and the conclusion that King was "[deleted]." King's [deleted] advantages for the Base Supply factor included [deleted] "significant" advantages; Avtel's [deleted] advantage for the Base Supply factor included [deleted] significant advantages. As stated above, plaintiff has not demonstrated that its ratings were inappropriate. Moreover, even if the Army had raised Avtel to the next rating level, to a "[deleted]" or an "[deleted]," the record reflects the superiority of King's technical proposal, which, when combined with King's lower-priced proposal, provided a reasonable basis for the award to King. The court finds that Avtel has not shown the technical evaluation to be biased, arbitrary, capricious or unreasonable.

Avtel also contends that the past performance [9] evaluation illustrates government bias against Avtel. According to the Source Selection Decision, King and Avtel were both evaluated as "[deleted]" in the area of past

---

9. Concerning past performance evaluations, the FAR states that:

> (2) *Past performance evaluation.* (i) Past performance information is one indicator of an offeror's ability to perform the contract successfully. The currency and relevance of the information, source of the information, context of the data, and general trends in contractor's performance shall be considered. This comparative assessment of past performance information is separate from the responsibility determination required under subpart 9.1.
>
> (ii) The solicitation shall describe the approach for evaluating past performance, including evaluating offerors with no relevant performance history, and shall provide offer-

ors an opportunity to identify past or current contracts (including Federal, State, and local government and private) for efforts similar to the Government requirement. The solicitation shall also authorize offerors to provide information on problems encountered on the identified contracts and the offeror corrective actions. The Government shall consider this information, as well as information obtained from any other sources, when evaluating the offeror past performance. The source selection authority shall determine the relevance of similar past performance information.

48 C.F.R. § 15.305(a)(2)(I), (ii) (2004); *see also* 48 C.F.R. subpart 42.15—Contractor Performance Information (2004).

performance. Avtel believes its [deleted] rating was appropriate, given its work as the incumbent on the prior Dash 7 contract. Avtel argues, however, that King should not have been awarded a [deleted] rating for past performance, since King's rating was based on the E9–A aircraft, which is not similar in scope, size, and complexity to the requirements of the Dash 7 solicitation. Plaintiff argues that King's E9–A contract involved, for example, the maintenance of only two aircraft, each with only two engines, compared to the nine aircraft each with four engines under the Dash 7 contract. Plaintiff also argues that the Dash 7 contract requires support for more flying hours than King's E–9A contract, and that the Dash 7 contract requires operations outside the continental United States, in contrast to the E–9A contract, which does not. If plaintiff were rating King on past performance, the plaintiff states that King would have received either a "Neutral" rating, used when a performance record cannot be identified, or a "Moderate" rating, used when there is some doubt that an offeror will successfully perform the contract. However, "[a] protester's mere disagreement with the agency's evaluation determination does not provide a basis for sustaining the protest." *Gonzales Consulting Servs., Inc.,* B–291642.2, 2003 CPD ¶ 128, 2003 WL 21768082, at *5 (Comp.Gen. July 16, 2003) (citation omitted).

In support of its past performance argument, plaintiff cites *Beneco Enterprises, Inc.,* B–283512.3, 2000 CPD ¶ 176, 2000 WL 1662990 (Comp.Gen. July 10, 2000). The solicitation in *Beneco Enterprises* specifically stated that: "The Government will focus on information that demonstrates quality of performance relative to the size and complexity of the procurement under consideration." *Id.* at *2. The Government Accountability Office stated that:

> [A]lthough the RFP clearly contemplated a qualitative assessment of the quality of performance of contracts relative to the size and complexity of the job order construction contract being procured, the agency unreasonably gave the highest possible rating to Hammer, a contractor with experience performing only relatively small dollar construction projects and with no JOC [job order contract] prime contractor experience, and unreasonably rated Beneco lower under past performance than Hammer, even though Beneco has an extensive record of successfully performing job order construction contracts, including the incumbent contract.

*Beneco Enters., Inc.,* 2000 WL 1662990, at *2.[10]

By way of comparison, the Dash 7 solicitation's Section L, Instructions, Conditions, and Notices to Offerors, states, as to past performance:

> d. Volume II Past Performance:

> The offeror shall submit data that contains the offerors and major subcontractors U.S. Government and commercial contract past or current performance over the last 5 years on contracts or subcontracts for the same or similar hardware (Fixed Wing) and effort (Logistics and Engineering Services) required by the solicitation. The offeror shall not include data from other divisions, entities or subcontractors not planned for direct involvement during the execution of the program. Data shall be provided for those contracts that exceeded $20M and subcontracts that exceeded $5M for same or similar work.

As to past performance, the Dash 7 solicitation's Section M, Evaluation Factors for Award, further states:

> b. Volume II. Past Performance: Ability of the offeror to execute and perform the requirements set forth in this solicitation as indicated by the offeror's record of past and current performance. The Government will focus on the inquiries of the offeror's and major subcontractor's performance.

---

**10.** Plaintiff also cites *Georgia Power Company,* B–289211.5, B–289211.6, 2002 CPD ¶ 81, 2002 WL 1003523, at *5 (Comp.Gen. May 2, 2002), in which the solicitation provided for an evaluation of an offeror's past performance as to " 'the scope, magnitude and complexity' " of the requirements in the solicitation, as in *Beneco Enterprises*. The Government Accountability Office found that the Army Corps of Engineers did not consider the awardee's past performance on contracts of similar size, scope and complexity of the requirements of the solicitation. *Id.*

The most recent (within the past five years), the most relevant (logistics and engineering services), from contracts in excess of $20M for the Prime Contractor and $5M for the Major Subcontractors.... The specific elements to be evaluated in this area are Quality of Service, Schedule, Cost Control, Business Relations, and Management of Key Personnel.

The language of the Dash 7 solicitation, therefore, emphasizes contract experience over the last five years, on similar fixed wing aircraft, for similar logistics/engineering services, on contracts that exceeded $20 million. The Army's Performance Risk Assessment concluded that the E9–A provided King with recent experience, of a logistics and engineering services nature, over contracts of the proper size. The Army's Performance Risk Assessment Group (PRAG) "considered the offerors' record of past and current performance to ascertain the probability of successfully performing the required efforts of this solicitation." In regard to King's relevant experience with this particular type of contract, the Source Selection Decision stated:

KING, AVTEL and VOYAGEUR were all assigned a [deleted] in the Past Performance Area. Each offeror either has experience of the same or similar effort or their proposed subcontractors have the necessary experience. KING has experience with the U.S. Air Force DHC–8 logistics support. King was awarded the contract in 2001 with options that will run through September 2010 should all options be exercised. As part of this contract, King provides contractor logistic support, contractor operated main base supply (COMBS), field team services, drop-in maintenance, component overhaul/repair including engines, engineering interface and spare parts acquisition. King was also the logistics support contractor on the previous contract for the DHC–8 aircraft that ended in December 2000.

King's past performance on the E–9A aircraft included functions similar to those required under the Dash 7 solicitation, including maintenance, modification, engineering, corrosion control, painting, and engine maintenance. King's past performance on the E–9A was not required to be identical to the Dash 7 work required by the solicitation, only similar. *See University Research Co., LLC v. United States*, 65 Fed.Cl. 500, 508 (2005) (the solicitation asked " 'for *similar* products or services,' not identical ones," and "no ranking of relative relevance is mandated.") (emphasis in original). Also, as noted above in the Source Selection Decision, the past performance of King's proposed subcontractors was included in the Army's Performance Risk Assessment that led to King's [deleted] rating. *See Information Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 352 (2001) (finding the agency acted properly in considering the past performance evaluations of an offeror's subcontractors, and assigning a high confidence past performance rating to the prime contractor), *aff'd*, 316 F.3d 1312 (Fed.Cir.2003). The Army's extensive Performance Risk Assessment on King provided a reasonable basis for a [deleted] rating based on past performance of similar work. Under these circumstances, the court will not substitute its judgment for that of the agency. *See Consol. Eng'g Servs., Inc. v. United States*, 64 Fed.Cl. at 637 (noting that an agency's evaluation of past performance is within the discretion of the contracting officials, and will not be overridden by a court unless the evaluation is unreasonable, or inconsistent with the solicitation or applicable statutes and regulations) (citation omitted); *Gulf Group Inc. v. United States*, 61 Fed.Cl. at 353 ("[T]he role of the Court in the review of a bid protest is not to second-guess the judgment of the government decision makers. As long as these individuals considered the relevant factors and information and articulated a reason for their decision that is not clearly erroneous, the Court will defer to the judgment of the Executive branch.") (citations omitted). The record does not support plaintiff's allegation of bias in the past performance evaluation.

### 3. *Allegation that Kent Lebo was Invited to Compete Against Avtel*

██ In attempting to show bias, the plaintiff also argues that the contracting officer personally contacted former Avtel owner Kent Lebo, and requested that he bid on the Dash 7 contract against Avtel. The plaintiff

cites to FAR 15.306(e)(1) for the proposition that, "Government personnel involved in the acquisition shall not engage in conduct that— (1) Favors one offeror over another . . . ." 48 C.F.R. § 15.306(e)(1) (2004). The plaintiff also cites to FAR 1.602–2(b), which states that a contracting officer must "(b) [e]nsure that contractors receive impartial, fair, and equitable treatment" in the procurement process. 48 C.F.R. § 1.602–2(b) (2004).

The plaintiff argues that the government breached its obligation to act in good faith and to ensure an impartial and equitable consideration of all offerors. Generally, the plaintiff argues that the integrity of the procurement process was diminished when the Army allegedly asked Mr. Lebo to bid on the Dash 7 solicitation. The plaintiff provided an unsigned memorandum from Keith Weaver, a King Aerospace employee, stating that Kent Lebo had indicated he had been asked by the Dash 7 contracting officer if he (Mr. Lebo) would be interested in bidding on the solicitation. The plaintiff also submitted the declaration of Avtel employee Jim Johnson, which stated that Kent Lebo told him that Carole Hubbard, the contracting officer, had called and asked him (Mr. Lebo) to bid on the Dash 7 contract.

However, the Dash 7 contracting officer, Carole Hubbard, stated in a declaration that she never contacted Mr. Lebo for any purpose, as follows: "I have never contacted or been contacted by Kent Lebo to solicit him as a source to compete against AVTEL or for any other reason. I have never spoken with Kent Lebo in my life." In a deposition, Mr. Lebo confirmed Ms. Hubbard's sworn statement. Mr. Lebo stated that he had never communicated with Carole Hubbard or anyone else in the Army on matters concerning Avtel or the Dash 7 contract:

Q. [by Avtel's counsel]: There is a paragraph at the—not the last paragraph but the next-to-last paragraph [of Keith Weaver's memorandum] that begins, Lebo confirmed that he had been asked by the current Dash 7 contracting officer if Lebo would be interested in bidding the Dash 7 contract. Tell me how that conversation came about with the contracting officer.

A. [by Mr. Lebo]: I think I'd have to dispute that. I haven't talked to anyone in the Army. Someone told me that the Army contracting people were asking if I was going to bid on it, and I don't recall—that might have been [Avtel employee] Wilbanks; it might have been someone else. It wasn't someone from the Army. So from that standpoint, this is not correct. They got that wrong. I didn't tell them I'd been talking to the Army.

Kent Lebo further stated, when asked whether he had engaged in a conversation with Carole Hubbard, that he did not even know her:

Q. [by Avtel's counsel] Okay. Do you know Carol[e] Hubbard? Do you know who she is?

A. [Mr. Lebo] That name sounds vaguely familiar, but no.

Q. She's the contracting officer on this solicitation.

A. Okay. I've probably seen her name on the RFP.

Q. But you haven't had any conversation with Carol[e] Hubbard?

A. I don't know the lady.

Q. Or Lisa Bridges, who is her contract specialist?

A. I think there was another lady. Who's that other lady in there.

Q. Henrietta Maples?

A. Yeah. I've met her.

Q. Have you talked to Henrietta [Maples] since that solicitation?

A. No. Not since I left Avtel.

Q. Okay.

Plaintiff has not demonstrated that the Army contacted Mr. Lebo to invite his participation in the Dash 7 solicitation.[11] As with

11. Although the parties have not addressed and the court does not reach the issue, had the Army contacted Mr. Lebo to invite his participation, it is not clear that attempts to expand the bidder's list automatically are violative of the FAR or prejudicial to the plaintiff, as suggested by plaintiff. The court notes that competition in government procurement from multiple sources is actually encouraged, see FAR 6.000 ("This part prescribes policies and procedures to promote full and open competition in the acquisition process . . . ."), as are procedures to identify poten-

the allegations of bias addressed earlier, plaintiff has failed to make out a case of bias and prejudice with respect to its allegation that Mr. Lebo was invited to compete against Avetl. As the United States Court of Appeals for the Federal Circuit has stated:

> A major thrust of the decision of the Claims Court was that there was both the opportunity for and the appearance of impropriety in that process. That was not an adequate or proper basis for enjoining the award of the contract to Sterling.

> \* \* \* \* \* \*

> We conclude that the Claims Court ruling that the Department's award of the contract to Sterling would be "arbitrary, capricious, and an abuse of discretion" because of the possibility and appearance of impropriety is not supported by the record and therefore is not a proper basis for enjoining award of the contract. The Claims Court based its inferences of actual or potential wrongdoing by the Department on suspicion and innuendo, not on hard facts. The kind of inquiry and analysis the Claims Court made in this case, which without factual basis ascribed evil motive to four member of the Technical Evaluation Committee in their handling of bids, was clearly erroneous and did not justify an injunction against the government's award of the contract to Sterling.

*CACI, Inc.–Federal v. United States,* 719 F.2d at 1581–82; *see also Four Points by Sheraton v. United States,* 63 Fed.Cl. at 344 (finding that allegations of bad faith and bias must rest on strong evidence in order to overcome the presumption of regularity and good faith); *Orion Int'l Tech. v. United States,* 60 Fed.Cl. at 344 ("[A]llegations of bad faith must rest on a strong evidentiary footing to overcome the normal presumption of regularity and good faith conduct by agency officials . . . .") (citations omitted). In the present case, there is no record evidence which indicates bias on the part of the Source Selection Authority, Contracting Officer, or the Source Selection Evaluation Board evaluators.

Plaintiff has not met its burden of rebutting the presumption, with "clear and convincing evidence," that during the procurement process, the agency officials acted in good faith and with honesty. Therefore, Avtel *does not prove,* and the record does not establish, that there was government bias which precluded Avtel from fair and impartial consideration in the 2004 Dash 7 procurement.

*Publication of Naval Postgraduate School Thesis*

■ Plaintiff complains that Henrietta Maples, a contracting officer's representative on the prior, 1999 Dash 7 program on which Avtel was the awardee, used sensitive information obtained as a government official for her Naval Postgraduate School thesis titled, "Contractors on the Battlefield: A Case Study of the Airborne Reconnaissance Low (ARL) Life–Cycle Logistics Support Contract—March 2000 through August 2001." This ninety-seven page, December 2001 thesis was written in partial fulfillment of the requirements for Ms. Maples' Master of Science degree in Program Management from the Naval Postgraduate School. The cover page of the thesis was marked: "Approved for public release; distribution is unlimited." The Naval Postgraduate School made the thesis available to the public through the internet.

According to the plaintiff, some of the information in the thesis was sensitive, including information on staffing, mission capability, personnel turnover and compensation. The plaintiff contends that the placement of the Maples thesis in the public domain constituted a breach of the government's implied covenant of good faith and fair dealing. *See Centex Corp. v. United States,* 49 Fed.Cl. 691, 708 (2001) ("All contracts, including government contracts, contain an implied covenant of good faith and fair dealing.") (citations omitted); Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith

---

tial sources, *see* FAR 10.002(b)(2)(i) (listing market research techniques, including contacting knowledgeable individuals in Government and industry). 48 C.F.R. §§ 6.000, 10.002(b)(2)(i) (2004).

and fair dealing in its performance and its enforcement.").

However, in order for the plaintiff to prevail on its claim that the government breached its duty of good faith and fair dealing in making the thesis public, plaintiff again must overcome the presumption that government officials act in good faith in the discharge of their duties. *See ManTech Comm. and Info. Sys. Corp. v. United States*, 49 Fed.Cl. at 74 n. 26. To overcome this presumption, the plaintiff must produce "well-nigh irrefragable proof" of bad faith on the part of the government. *Kalvar Corp. v. United States*, 211 Ct.Cl. at 198, 543 F.2d at 1301–02 (quoting *Knotts v. United States*, 128 Ct.Cl. at 492, 121 F.Supp. at 631). " 'Almost irrefragable proof' amounts to 'clear and convincing evidence' " of bad faith on the part of the government. *Galen Medical Assocs., Inc. v. United States*, 369 F.3d at 1330 (quoting *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1239–40). "In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff." *Galen Medical Assocs., Inc. v. United States*, 369 F.3d at 1330 (quoting *Torncello v. United States*, 231 Ct.Cl. at 45, 681 F.2d at 770); *see also Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d at 1240 (noting with approval cases which compared bad faith variously with actions motivated by malice, conspiracy, oppressive conduct, and with officials actuated by animus against a particular plaintiff) (citing *Kalvar Corp. v. United States*, 211 Ct.Cl. at 198, 543 F.2d at 1302).

In this regard, the record does not reflect that any government official released Ms. Maples' thesis with the specific intent to injure Avtel. There is no evidence that the release decision on the thesis was motivated by malice or ill will against Avtel. The record reflects, instead, a degree program with a thesis requirement, and Ms. Maples choosing a familiar topic. With hindsight, publication of this particular thesis prior to the 2004 Dash 7 resolicitation may not have been wise. However, regardless of the wisdom or appropriateness of the publication of the thesis, a distinction must be made between the publi-

cation of a Master's level thesis by the Naval Postgraduate School and Ms. Maples, and malice toward Avtel. The latter is required for plaintiff to make out a case for the breach of good faith and fair dealing. The record does not reflect the requisite malice or specific intent to injure. Nor does the record reflect that King Aerospace played any part in the placement of the thesis in the public domain.

### Plaintiff's Cost and Pricing Allegations

Plaintiff also argues that the Army could not conclude that King's price was fair and reasonable because, even though the Defense Contract Audit Agency (DCAA) conducted an audit of King's proposal, the audit was not, in plaintiff's words, "a full cost realism analysis," and did not validate the reasonableness or realism of King's pricing. According to the plaintiff, the DCAA audit concluded that King did not possess "[deleted]," such that award to King should have been precluded under the FAR.

Defendant argues, in a short footnote in its response brief, that the above contentions are not found in the plaintiff's July 15, 2005 first amended complaint and, therefore, are not properly before the court. The plaintiff's first amended complaint alleges, among other things, that King's cost proposal was unbalanced, that only price analysis was performed by the Army on King's proposal, not cost analysis, quotes the FAR, and alleges that King's price was not "fair and reasonable." *See* FAR 15.404–1(a) ("The objective of proposal analysis is to ensure that the final agreed-to price is fair and reasonable."). It could be argued that the plaintiff's concerns about the DCAA audit, cost realism and supporting cost accounting systems were all subsumed within the cost allegations that are contained in the first amended complaint. However, even if they were not, and even if the plaintiff were permitted to file a second amended complaint alleging more explicitly some of the cost matters argued in its brief, plaintiff would not prevail on these allegations, as discussed below.

Again, plaintiff notes that FAR 15.404–1(a) requires that the final agreed price be fair and reasonable, and argues that although a DCAA audit of the King proposal was per-

formed, the audit did not "validate the reasonableness or realism of King's pricing." The DCAA audit evaluated "direct labor rates, indirect rates, and labor escalation factor. . . . We [the DCAA auditors] verified the proposed direct labor hourly rates for the 'Over and Above' work in CLINs 005, 007, 008, 012, and 014. We also verified the material handling rate to the contractor's calculation." The contracting officer then performed a prenegotiation price analysis "to determine the accuracy, completeness and realism of the proposals," and concluded that, "[i]n accordance with FAR 15.404–1(a)(1) and (2), it is hereby determined that adequate price competition has been obtained." The cited FAR 15.404–1(a)(1) provision, titled "Proposal analysis techniques," is instructive on the role of the contracting officer:

(1) The contracting officer is responsible for evaluating the reasonableness of the offered prices. The analytical techniques and procedures described in this section may be used, singly or in combination with others, to ensure that the final price is fair and reasonable. The complexity and circumstances of each acquisition should determine the level of detail of the analysis required.

48 C.F.R. § 15.404–1(a)(1) (2004). The various analysis techniques listed include price analysis, cost analysis, cost realism analysis, and technical analysis. 48 C.F.R. § 15.404–1(b), (c), (d), (e) (2004). Price analysis includes comparing the proposed prices of offerors with each other and comparing the proposed prices with an independent government cost estimate. 48 C.F.R. § 15.404–1(b)(2)(i), (v) (2004). As noted above, price analysis, including comparison with the independent government cost estimate, was employed in the solicitation at issue, and the FAR provides that, "[n]ormally, adequate price competition establishes price reasonableness . . . ." 48 C.F.R. § 15.404–1(b)(2)(i).

Cost realism analysis is defined in the FAR to include the concept of a "probable cost":

(1) Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

(2) Cost realism analyses shall be performed on cost-reimbursement contracts to determine the probable cost of performance for each offeror.

(i) The probable cost may differ from the proposed cost and should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal. The probable cost shall be used for purposes of evaluation to determine the best value.

(ii) The probable cost is determined by adjusting each offeror's proposed cost, and fee when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis.

48 C.F.R. § 15.404–1(d)(1), (2) (2004).

The source selection plan for the solicitation stated that the pricing team would evaluate the most probable price of each offeror's proposal and that the cost reimbursable CLINs would be evaluated for "both realism and reasonableness." The Army's price negotiation memorandum stated that King's proposed price was determined to be fair and reasonable based on adequate price competition and comparison to the independent government cost estimate. According to the prenegotiation objective memorandum and source selection decision, the independent government cost estimate was included for the cost reimbursable CLINs. Use of the independent government cost estimate served as a probable cost for the cost reimbursement CLINs and as part of the Army's cost realism analysis. The DCAA audit, independent government cost estimate, and prenegotiation price analysis were used for the Army's cost realism analysis. As a result, in the court's view, plaintiff has failed to demonstrate that King's price was not fair and reasonable.

As noted above, plaintiff also argues that the DCAA audit of King, in plaintiff's words,

"concluded that King [deleted], so an award is precluded under FAR § 16.301–3(a)." The cited FAR provision states that a cost-reimbursement contract may be used only when "[t]he contractor's accounting system is adequate for determining costs applicable to the contract . . . ." 48 C.F.R. § 16.301–3(a)(1) (2004). Although the contract at issue is a fixed price contract, it includes some cost reimbursable CLINs, perhaps leading the plaintiff to raise the issue of the adequacy of King's supporting cost accounting system.

The audit report actually stated that DCAA auditors had not performed a recent cost accounting system review, but [deleted]. King has asserted, and has not been contradicted by plaintiff, that its [deleted]. In this particular area, the court finds that plaintiff has not demonstrated a FAR violation that would preclude award to King.

Plaintiff also argues that the Army violated the FAR by performing only price analysis, and not cost analysis. Plaintiff points out that the solicitation at issue required offerors to submit cost and pricing data, and that FAR 15.404–1(a)(3) provides: "(3) Cost analysis shall be used to evaluate the reasonableness of individual cost elements when cost or pricing data are required." 48 C.F.R. § 15.404–1(a)(3) (2004). The Army did not conduct cost analysis on the offers for the solicitation at issue.

However, the FAR defines cost or pricing data as "data requiring certification in accordance with 15.406–2." 48 C.F.R. § 2.101. With this definition in mind, the solicitation contains a Section L, titled "Instructions, Conditions, and Notices to Offerors," and a paragraph within that section, L–18, which provides that: "Each offeror is cautioned to submit cost/price information which is fully responsive to this RFP. Certification of cost and pricing data is not currently required: The Government reserves the right to request a certificate prior to award (in the event adequate competition is not present)." The government, in fact, never requested that the cost and pricing information be certified with the FAR 15.406–2 certificate of current cost or pricing data, having found that adequate competition was present for the procurement. On this last point, the

FAR provides that adequate price competition, defined in part as stemming from two or more responsible offerors, is one of the exceptions to the requirement for certified cost and pricing data. See 48 C.F.R. § 15.403–1(b)(1), (c)(i) (2004).

Avtel cites *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed.Cl. 502 (2003), as a decision in which the court held that the Army had violated procurement regulations by not performing a cost analysis. The case, however, is distinguishable from the present case. In *Al Ghanim*, the court found that a cost analysis was required to be performed, but was not. *Id.* at 513. In the present case, this court finds no requirement for a cost analysis to be performed, due to the existence of adequate price competition. Moreover, the Army properly performed price analysis techniques in the present case.

The court concludes that, contrary to plaintiff's contention, the Army was not required to perform a cost analysis for this procurement. Although cost and pricing information was submitted by the offerors, the Army subsequently found that the existence of adequate price competition obviated the need to cause the parties to certify the information as accurate, complete and current cost and pricing data, and obviated the need to perform a cost analysis.

◼ Plaintiff also argues that King's proposal contained materially unbalanced pricing. The FAR provides that "[u]nbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as is indicated by the application of cost or price analysis techniques." 48 C.F.R. § 15.404–1(g)(1) (2004). The FAR continues:

> (2) All offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced. If cost or price analysis techniques indicate that an offer is unbalanced, the contracting officer shall—
>
> (i) Consider the risks to the Government associated with the unbalanced pricing in

determining the competitive range and in making the source selection decision; and (ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance.

(3) An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.

48 C.F.R. § 15.404–1(g)(2), (3).

Avtel contends that King's total price for the Dash 7 procurement contains certain CLINs that are "significantly lower" than the price on Avtel's corresponding CLINs, and also "grossly inconsistent" with King's pricing for maintenance on a similar aircraft. Specifically, King's proposed price for the Dash 7 CLIN item, "Strip and Repaint," was [deleted], compared to Avtel's price of [deleted] for the same item. Avtel also points to King's 2005 [deleted] price for the "Strip and Repaint" function for the E–9A, an aircraft Avtel described as similar to the DeHavilland Dash 7 in this context. From these price differences, plaintiff concludes that King's proposal was materially unbalanced, and that King would be able to recoup its losses from the low price via the cost-reimbursable CLINs. In response, King cites specific differences in the scope, complexity and magnitude of the strip and paint function between the two aircraft to account for the pricing differences. The differences between the aircraft highlighted by King involve special hanger availability/access for the E–9A, special equipment required to be provided on-site for the E–9A, removal and reinstallation of the E–9A's telemetry antenna radome and surveillance radar, as well as other unique E–9A work. Although plaintiff had the opportunity to respond to these distinctions in its reply brief, it chose not to do so.

Avtel also contends that King's pricing for material of [deleted] per flight hour for the Dash 7 solicitation totals approximately [deleted] per year below Avtel's price for the same item. Avtel notes that King's cost of material for the E–9A, described by Avtel as similar to the Dash 7 aircraft in this solicitation, was [deleted] per flight hour, a substantially greater price than the price King proposed in the current solicitation for the Dash

7. Avtel again claims that the flight hour pricing demonstrates that King submitted an unbalanced offer. King responds that there are reasons for the pricing differences between the Dash 7 and the E9–A aircraft. Avtel itself acknowledges in its brief that the E9–A contract requires support for far fewer hours, compared to the level of effort required for the Dash 7. The higher the flying hours, the lower the hourly rate. The lower the flying hours, the higher the hourly rate. In addition, King points out that there are nine Dash 7 aircraft compared to only two E–9A, resulting in a relatively higher per hour cost for the E–9A. Although plaintiff had the opportunity to respond to these distinctions in its reply brief, it chose not to do so.

The Army did not find that King's prices were unbalanced, but fair and reasonable, and awarded on that basis. The court agrees. The plaintiff has not demonstrated that King's prices were unbalanced merely by showing that they were lower than the plaintiff's prices, and lower than the prices for maintenance on another aircraft. King has provided reasons for the difference in prices between the Dash 7 aircraft and the E9–A, which plaintiff has not attempted to rebut. Under plaintiff's reasoning, any and all lower price offers could be considered unbalanced and rejected rather than accepted. Furthermore, plaintiff has not demonstrated and the record does not reflect that award of the contract to King "will result in paying unreasonably high prices for contract performance." 48 C.F.R. § 15.404–1(g)(2)(ii); *see also CCL Serv. Corp. v. United States,* 48 Fed.Cl. 113, 122 (2000) (the court rejected the allegation that the awardee's prices were unbalanced, upholding the agency's conclusion that the awardee's prices were reasonable, based on the agency's price analysis and comparisons with the independent government cost estimate); *J & D Maint. and Servs. v. United States,* 45 Fed. Cl. 532, 536–37 (1999) ("[W]e find that the FAR and RFP only prohibit *materially* unbalanced bids, and that Ashe's bid would only be materially unbalanced if it posed an unacceptable risk to the government, which it does not.") (emphasis in original) (citing *Red*

*River Serv. Corp.*, B–282634.2, 1999 WL 644445 (Comp.Gen. July 15, 1999) (the Comptroller General upheld the agency's decision to award the contract to a contractor despite unbalanced pricing in its proposal because the unbalancing did not pose an unacceptable risk to the government and would not result in government paying unreasonably high prices)); *Citywide Managing Servs. of Port Washington, Inc.*, B–281287.12, B–281287.13, 2001 CPD ¶ 6, 2000 WL 33121998, at *5 (Comp.Gen. Nov. 15, 2000) (the agency's price analysis did not indicate that the awardee's prices were unbalanced, and the record before the court did not reflect a material risk to the government of ultimately paying unreasonably high prices). The court finds plaintiff's cost and pricing allegations to be without merit.

*Injunctive Relief*

 Plaintiff seeks injunctive relief. Courts, however, should interfere with the government procurement process "only in extremely limited circumstances." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003) (quoting *CACI, Inc.–Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir.1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d at 1372)), *aff'd*, 365 F.3d 1345 (Fed.Cir.2004); *see also ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed.Cl. at 64 (2001) (emphasizing that injunctive relief is not routinely granted) (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)). Because injunctive relief is extraordinary in nature, a plaintiff must demonstrate the right to such relief by clear and convincing evidence. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1223 (Fed.Cir. 2004) (upholding the trial courts finding that "injunctions do not issue 'for every violation of the law . . . .'" (quoting *PGBA, LLC v. United States*, 60 Fed.Cl. 196, 222 (2004))); *Bannum, Inc. v. United States*, 56 Fed.Cl. 453, 457 (2003) (quoting *Bean Dredging Corp. v. United States*, 22 Cl.Ct. 519, 522 (1991)), *aff'd*, 404 F.3d 1346 (Fed.Cir.2005); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed.Cl. 560, 566 (2000); *Delbert Wheeler Constr., Inc. v. United States*, 39 Fed.Cl. 239, 251 (1997), *aff'd*, 155 F.3d 566 (Fed.Cir.1998) (table); *Compliance Corp. v. United States*,

22 Cl.Ct. at 206 & n. 10; *but see Magnavox Elec. Sys. Co. v. United States*, 26 Cl.Ct. 1373, 1378 & n. 6 (Fed.Cir.1992). The decision on whether or not to grant an injunction is within the sound discretion of the trial court. *See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993); *Asociacion Colombiana de Exportadores de Flores v. United States*, 916 F.2d 1571, 1578 (Fed.Cir.1990). Confirming the difficult nature of obtaining injunctive relief in a bid protest case, the United States Court of Appeals for the Federal Circuit has stated that even if a trial court finds that the government's actions in soliciting and awarding a contract were arbitrary, capricious, or not in accordance with law, the trial court retains discretion on whether to issue an injunction. *See PGBA, LLC v. United States*, 389 F.3d at 1225–26 (finding that the statutory scheme for reviewing procurement decision "does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate," and that 28 U.S.C. § 1491(b)(4) "does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award."). Once injunctive relief is denied, "the movant faces a heavy burden of showing that the trial court abused its discretion, committed an error of law, or seriously misjudged the evidence." *FMC Corp. v. United States*, 3 F.3d at 427.

To obtain a temporary restraining order or preliminary injunction, the plaintiff must carry the burden of establishing entitlement to extraordinary relief based on the following factors:

> (1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties.

*U.S. Ass'n of Importers of Textiles and Apparel v. United States*, 413 F.3d 1344, 1346 (Fed.Cir.2005) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed.Cir. 1983)); *see also Pharmaceutical Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644, 670, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (requiring a movant for preliminary injunction to prove that the "probability of success on the merits of its claims . . . the risk of irrepa-

rable harm, the balance of the equities, and the public interest" weigh in the movant's favor); *Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1568 (Fed.Cir.1993) (finding a preliminary injunction to be a "drastic and extraordinary remedy that is not to be routinely granted"), *cert. denied,* 510 U.S. 1092, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994); *Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. 520, 523–24 (2003); *OAO Corp. v. United States,* 49 Fed.Cl. 478, 480 (2001) (" 'When deciding if a TRO is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction,' " while highlighting that a preliminary injunction must not be granted unless the movant persuades through clear evidence. (quoting *W & D Ships Deck Works, Inc. v. United States,* 39 Fed.Cl. 638, 647 (1997))); *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. at 616. The United States Court of Appeals for the Federal Circuit, in *National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.,* noted that:

> [A] movant is not entitled to a preliminary injunction if he fails to demonstrate a likelihood of success on the merits. . . . In other words, a district court cannot use an exceptionally weighty showing on one of the other three factors to grant a preliminary injunction if a movant fails to demonstrate a likelihood of success on the merits.

*Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.,* 357 F.3d 1319, 1325 (Fed.Cir.) (citation and footnote omitted), *reh'g and reh'g en banc denied* (2004). In addition, a movant is confronted by a more substantial burden of proof when it seeks injunctive relief which would interfere with and infringe upon governmental operations if granted. *See Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944) ("But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." (citing, among other cases, *Virginian Ry. Co. v. Sys. Fed'n No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937) (clarifying that even private controversies, to the extent they may seriously impair service to the public, are a matter of public concern))) (footnote omitted).

Plaintiff seeks permanent injunctive relief, cancelling the award to King Aerospace, reinstating the prior Avtel contract, and a re-solicitation of the Dash 7 maintenance and logistical services procurement. The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires actual success on the merits. *See Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (holding that the standard for permanent injunction is the same as that for preliminary injunction, with the one exception being that the plaintiff must show actual success on the merits, rather than likelihood of success). In *PGBA, LLC v. United States,* the Federal Circuit set out the test for a permanent injunction, stating that a court must consider:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States,* 389 F.3d at 1228–29 (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. at 546 n. 12); *see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.,* 357 F.3d at 1325 (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief); *Int'l Res. Recovery, Inc. v. United States,* 64 Fed. Cl. 150, 159 (2005); *Hunt Building Co., Ltd. v. United States,* 61 Fed.Cl. 243, 279 (2004), *opinion modified,* 63 Fed.Cl. 141 (2004); *Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. at 320–21 (citing *Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 582 (2000), *aff'd,* 10 Fed.Appx. 957 (Fed.Cir.2001)); *ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. 489, 505 n. 10 (1997) (" 'The standard for a preliminary injunction is essentially the

same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.' " (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. at 546 n. 12, 107 S.Ct. 1396)). The court is not persuaded that the extraordinary remedy of permanent injunctive relief is warranted in this case.

The plaintiff contends that it would be irreparably harmed if injunctive relief were not granted. Generally, "[l]ost profits and a lost opportunity to compete constitute irreparable injury." *Labat–Anderson Inc. v. United States*, 50 Fed.Cl. 99, 110 (2001); *see also United Payors & United Providers Health Servs., Inc. v. United States*, 55 Fed.Cl. 323, 333 (2003) ("[L]ost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm." (citing *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed.Cl. 312, 323 (1998))). Defendant argues that, with three offerors, it is speculative that Avtel would have been awarded the Dash 7 contract. However, given the final ratings of the three offerors reflected in the Source Selection Decision, the possibility of an award to Avtel is not out of the realm of possibility if the award had not gone to King. Of course, granting injunctive relief in favor of Avtel could correspondingly cause King Aerospace to lose the present contract and the same profits which are the basis for Avtel's irreparable harm, and could be relied on by King in a protest. Nor do the remaining factors make a case for injunctive relief for plaintiff.

The first, third and fourth factors, detailed above, tip the scales decisively against injunctive relief for the plaintiff. As discussed at length above, plaintiff has not succeeded on the merits of its case. For the reasons discussed earlier, the court finds that the agency's decision not to disqualify King was reasonable, and rejects plaintiff's ancillary claims. The first factor, therefore, success on the merits, weighs against the plaintiff.

Furthermore, the Tucker Act directs this court to "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action" when deciding bid protests. 28 U.S.C. § 1491(b)(3). A solicitation that addresses military preparedness implicates national security, which, thus, becomes a factor the court must consider in the balance of harms. *See PGBA, LLC v. United States*, 389 F.3d at 1226 (Fed.Cir.2004) (finding that section 1491(b)(3) instructs courts to give due regard to the issue of national defense and national security in determining appropriate relief); *Computer Sciences Corp. v. United States*, 51 Fed.Cl. 297, 323 (2002) (due to the impact on national security, injunctive relief was denied even if plaintiff could have succeeded on the merits); *Aero Corp., S.A. v. United States*, 38 Fed.Cl. 237, 241–42 (1997) ("The fact that a delay in the conduct of this procurement would raise national defense concerns clearly places the weight of the balance...of...harms factor on Defendant's side of the scale." (citing *Cincom Sys., Inc. v. United States*, 37 Fed.Cl. 266, 269 (1997))); *Rockwell Int'l Corp. v. United States*, 4 Cl. Ct. 1, 6 (1983) (indicating that requests for injunctive relief should give weight to national defense and national security concerns).

The particular mission of the 204th Military Intelligence Battalion to which the Dash 7 aircraft are assigned involves providing aerial reconnaissance to the United States Southern Command against terrorism and narcotics trafficking. A declaration from the then Commander of the United States Army Intelligence and Security Command, Major General John Kimmons, stated that the mission of the 204th Military Intelligence Battalion "is directed by the Joint Chiefs of Staff and is critical to National Security." Normally, the Battalion performs its reconnaissance operations with two Dash 7 aircraft deployed overseas and one Dash 7 aircraft remaining stationed stateside, which is used for training purposes for aircrews prior to their deployment overseas.

The Army had extended incumbent Avtel's Dash 7 contract given the pending bid protest before this court, but awarded the Dash 7 contract to King on June 30, 2005 because of concerns over the Dash 7 mission capable rate, which were described as eroding. Between February, 2004 and April, 2005, the defendant states that aircraft mission capable rates typically exceeded 70 percent and the 204th Military Intelligence Battalion conduct-

ed 90 percent of all assigned missions. Since then, the government contends, aircraft mission capable rates have fallen below 50 percent beginning in mid-April, 2005, with the Battalion unable to conduct a reconnaissance mission due to the lack of mission capable aircraft overseas.

For its part, Avtel argues that no maintenance issues have resulted from actions attributable to Avtel. Avtel attributes any decline in mission capable rates, in part, to the government grounding aircraft due to non-critical items that do not impact aircraft performance. Avtel also argues that it installed a faulty engine on one of the aircraft, but that this was not a matter within its control because the faulty engine was provided to Avtel for installation. Avtel also argues that the aircraft maintenance problems stem from a government-mandated cap on the number of Avtel contractor personnel. Because the personnel cap has not changed since November, 2004, however, Avtel's argument does not address the fact that mission capable rates have fallen below contract standards since April, 2005, a problem that the government points to as involving equipment, maintenance, and parts deficiencies. Avtel also attempts to contest the calculation of mission capable rates, but its argument is confusing and unconvincing.[12]

In addition, the plaintiff argues that the mission capable rates have been adversely affected by the removal on June 7, 2005 of Avtel's overseas site maintenance manager for unauthorized contact with host nation personnel on June 2, 2005, and his subsequent removal from the overseas site. Due to concerns that Avtel personnel had been ignoring deployment briefings concerning contact with host nation personnel, Avtel had issued a memorandum to its employees on April 5, 2005, prohibiting unauthorized and improper contact. Given the sensitivity of the mission of the Battalion, the overseas environment, and the prior notice of concerns about unauthorized contract with host nation personnel, the removal of the site manager

was well within the authority of the military. Furthermore, the record reflects that the decline in mission capable rates and Avtel's performance had been made a cause for concern and documented as early as April, 2005, two months prior to the site manager's removal. For example, the mission capable rate was 48 percent in April, 2005 and 45 percent in May, 2005. As a result, the government has stated that there was an unusual and compelling urgency as to why the contract had to be awarded to King Aerospace on June 30, 2005. The plaintiff must overcome the strong but rebuttable presumption that Army officials discharge their duties properly and in good faith. *See Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d at 1236, 1238–39 (in which the United States Court of Appeals for the Federal Circuit states that it is "loath to find to the contrary [of good faith]" (quoting *Schaefer v. United States,* 224 Ct.Cl. 541, 633 F.2d at 948–49)). The record does not reflect that the site manager's removal was the sole or even the primary cause of the decline in mission capable rates, and does not reflect that his removal stemmed from ulterior motives on the part of government officials, but rather from the inappropriate actions of the individual involved.

According to the declaration of Major General Kimmons, the 204th Military Battalion deployed its stateside training aircraft overseas as a temporary solution to the maintenance difficulties associated with the Dash 7 aircraft, but this action has impacted what the government contends is the critical mission of pre-deployment training of Army crew members stateside. Although the government acknowledges that the condition of the Dash 7 aircraft was not entirely the fault of Avtel, the government contends that Avtel's performance deteriorated since the government commenced using bridge, or extension contracts. In essence, the government has concluded that short-term fixes have had a negative impact on the mission. The court

12. Avtel contends that the government calculated the mission capable rate in a manner different from that stipulated in the contract. Avtel notes that the mission capable rate is calculated by comparing the number of reporting hours in a reporting period to the number of hours the aircraft were available for mission. However, looking at the calculation and formula exhibits provided by the government, it appears that the government used this same formula.

finds that the Army's posture is not unreasonable.

The government's national security argument is of paramount significance. *See Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* 56 Fed.Cl. at 521–22 (where neither party provided the court with information on the specific impact of a procurement delay on national security, the court nevertheless deferred to the government's national security argument, and denied injunctive relief); *SDS Int'l, Inc. v. United States,* 55 Fed.Cl. 363, 365–66 (2003). The defendant argues that the public interest is co-extensive with the defendant's interest to avert risks to military operations and national security. Essentially, the government's position is that disruptions in contract performance will directly affect national security and defense needs, thereby implicating and unduly harming the public interest. *See Magnavox Elec. Sys. Co. v. United States,* 26 Cl.Ct. at 1385. Balancing the interests of the parties, the court finds the interests of the Army and the public at stake are compelling. The court concluded earlier that the plaintiff has not achieved success on the merits. Given the urgency of having fully mission capable rates for the Dash 7 aircraft, and in light of this court's congressional charge to "give due regard to the interests of national defense and national security," 28 U.S.C. § 1491(b)(3), the court further concludes that the relative harm to the government and to the public interest caused by the delay that would result if injunctive relief were to issue substantially outweighs harm to the plaintiff. Accordingly, a permanent injunction will not issue in this case.

## CONCLUSION

For the foregoing reasons, plaintiff's bid protest and request for permanent injunctive relief are **DENIED**. The defendant's motion for judgment upon the administrative record is **GRANTED**. Each party shall bear its own costs.

**IT IS SO ORDERED.**